A10A0528, A10A0529. NORTHWEST PLAZA, LLC (MI) et al.
v. NORTHEAST ENTERPRISES, INC. et al.; and vice versa.
(699 SE2d 410)

ADAMS, Judge.

Northwest Plaza, LLC (MI), f/k/a Northwest Plaza, Inc., and RAW Associates, LLC (MI), f/k/a RAW Associates, LP, brought suit against Northeast Enterprises, Inc., Rick Tu, a/k/a Chang H. Tu, and Jim Tu, a/k/a Chin-Yuan Tu, asserting claims for fraud, breach of contract, conspiracy, conversion and punitive damages arising out of the purchase and sale of a shopping center. In Case No. A10A0528, Northwest and RAW appeal the trial court's grant of partial summary judgment to Northeast and the Tus on certain of their claims for breach of contract and fraud. In Case No. A10A0529, Northeast and the Tus cross-appeal the trial court's denial of their motion for summary judgment as to other claims for fraud, conspiracy and punitive damages.

On appeal from a grant or denial of summary judgment, this Court applies a de novo review "to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Field v. Lowery*, 300 Ga. App. 812, 813 (686 SE2d 422) (2009).

So viewed, the evidence shows that Richmar Properties, Inc., a Michigan corporation, is in the business of managing shopping centers. In late 2005, Richmar was in the market for new commercial property when it received a marketing package/offering memorandum for Covington Square Shopping Center in DeKalb County, Georgia, which was owned by Northeast. Several months later, Richmar received an updated offering memorandum, which included a "Tenant Summary" page showing each tenant and its annual payments for rent, tax and common area maintenance ("CAM") charges under the existing leases. These materials reflected that in April 2005, Northeast had begun renting a substantial space in Covington Square to Lee May Enterprises LLC, d/b/a Cinefe 8, for the operation of a movie theater. Cinefe had a five-year lease and was

one of Covington Square's two larger, anchor tenants. The marketing materials reflect that Cinefe paid $16,479.99 in rent per month, or $197,759.88 per year, including CAM charges and taxes.

Mark Walton, Richmar's president, and Robert Elmore, its chief financial officer, subsequently entered into negotiations with Rick and Jim Tu, two of Northeast's principals, for the purchase of Covington Square. In February 2006, Walton, Elmore, and Richmar employee Tammy Todd traveled to Georgia for two to three days to conduct due diligence on Covington Square by reviewing Northeast's books and records relating to the property. Although Richmar focused its examination on the period from January through December 2005, Northeast was only able to provide the tenant billing information for November 2005.

Following this visit, on February 28, 2006, Walton wrote Jim Tu to express concern about Cinefe, noting that the theater had only been in business for ten months, had bounced several checks, and was currently in a payment plan with Northeast to make up past due rents. Despite this and other stated concerns about the property, Walton's correspondence also enclosed a letter of intent on behalf of Richmar to purchase Covington Square, reflecting a price adjusted to account for these issues.

On March 2, 2006, Jim Tu wrote in reply, praising Cinefe's owner and stating that Cinefe had changed the type of movies it was showing, resulting in "much-improved sales." Jim Tu stated that he had "absolute confidence that all rents will be collected." Walton stated that these reassurances made him feel better about the property, although he acknowledged that he understood that Cinefe was still behind on its rent as of March 2. But during subsequent negotiations with the Tus, both Walton and Elmore came to understand that Cinefe "had made payments and was virtually caught up to within a few thousand dollars" in its past due rent payments. Rick Tu confirmed that as of late February, Cinefe was less than $2,500 behind in its rent.

On April 4, 2006, Walton, as president of Richmar, and Jim Tu, as president of Northeast, signed a "Shopping Center Purchase and Sale Agreement" for Covington Square, with a stated purchase price of $13,730,000. This Agreement was prepared by Richmar's attorneys. Because Jim Tu was in Georgia and Walton was in Michigan, the Agreement was executed in duplicate, with each side exchanging copies with the other. Among the warranties Northeast provided as Seller under the Agreement was the following:

> 6.3 The rental report ("Rent Roll") attached hereto as Exhibit C is a true and correct list of all of the Leases presently in force and affecting the Property and accurately

sets forth the information contained therein in all material respects; there are no leases or occupancy agreements entered into by Seller currently in effect which affect the Property other than those listed on Exhibit C (together with any additional leases approved by Purchaser); no amendment, modification, or supplement of any kind of the Leases exists other than as specified thereon; all rental and other payments due under the Leases as of the date hereof have been paid in full other than as specified thereon; and Seller has paid in full all expenses connected with the execution and delivery of the Leases other than as specified in the Rent Roll.

This section contemplated that a "Rent Roll" would be attached as Exhibit C to the Agreement, and on April 4, 2006, Jim Tu faxed him a rent roll for Covington Square dated April 1, 2006, but this document was never physically attached as an exhibit to the Agreement.[1] Elmore stated, however, that he understood the April 1 document to be the current "Rent Roll" for the property as of the date of the Sales Agreement.

In addition to the warranty under Section 6.3, Northeast also warranted as follows:

6.7 From the date of this Agreement to the Closing Date, Seller shall conduct its business involving the Property in the ordinary course, and during said period will: . . .

(b) Refrain from entering into any contracts or other commitments regarding the Property, other than in the ordinary and usual course of business, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed; . . .

(e) Deliver notice to Purchaser of: (i) any actions, suits, claims and other proceedings which are likely to have a material adverse [e]ffect on the value of the Property and that have been received by Seller; . . .

(g) Without the prior consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, Seller shall not cancel, materially amend, materially modify or accept surrender or termination of, or accept any advance rental under, any Lease unless pursuant to the terms thereof, enter into any new lease or (unless Seller is reasonably required to do so by the terms of a Lease) consent to any assignment or subletting of any Lease[.]

---

[1] The parties do not identify that rent roll as being part of the appellate record.

(Emphasis supplied.) The Agreement specified that Northeast's representations and warranties would survive the closing.[2]

Apparently, after making a rent payment of $10,000 on April 3, 2006, Cinefe stopped making payments after the Agreement was signed. Consequently, in early May 2006, Northeast filed a Dispossessory Warrant against Cinefe, seeking to evict Cinefe and claiming $37,456.92 in unpaid rent. Northeast subsequently re-filed its dispossessory warrant to claim $53,936.91 in back rent. But Northeast did not pursue the dispossessory action because on May 26, 2006, it reached an agreement with Cinefe for payment of the back rent. Rick Tu and Lee May, Cinefe's owner, entered into a written rent payment schedule, which provided that Cinefe would make up its past due rent by August 29, 2006. Northeast never told Richmar about either of its dispossessory filings, nor did it obtain Richmar's prior approval of the repayment plan.

Although the Agreement provided Richmar with the right to inspect the property and Northeast's books prior to closing, Richmar did not make a second inspection trip to Atlanta. But Richmar conducted a title search on the Covington Square property and reviewed additional documentation provided by Northeast. For example, approximately one week prior to the closing on the transaction, in late May 2006, Elmore requested and Northeast provided copies of the Covington Square tenant billing statements for June 2006. The statement for Cinefe, prepared May 11, 2006, showed no past due rent. In comparison, the Cinefe billing statement for November 2005, which Richmar reviewed in February 2006, had shown past due rent and other balances owing as of the date of the billing statement. Elmore stated that this led Richmar to believe that Cinefe was current in its rental payments.

Additional documentation Northeast provided in connection with the closing also failed to reflect any past due rent. Section 8.13 of the Agreement required Northeast to deliver an updated rent roll one day before closing. Elmore conceded that Richmar never requested an updated rent roll, and Walton could not recall seeing such a document. Nevertheless, Rick Tu brought a June 1, 2006 rent roll to the closing, which did not reflect that any of Cinefe's rent was past due. Rick Tu explained that past due amounts would not be reflected

---

[2] The Agreement further prohibited either party from making "any public disclosure of this Agreement without the prior express written consent of the other." Northwest and RAW contend that Jim Tu denied Walton's request to talk to the tenants about their finances, rent payment history or other issues concerning their tenancy. But in support of that contention, they cite to a "second deposition" by Walton, which is not a part of the appellate record; nor could we find any indication that the deposition was made a part of the record below.

on the rent roll:

> You could not find anything that said past due amount. The past due amount was only based on my own calculation and then reflected on the monthly statements. . . . I didn't specifically write down how much was past due.

According to Rick Tu, rent rolls simply list the tenants, the monthly rent and payment, and the contact information. Any past due balances are generally kept in something called a ledger, but Rick Tu, who had no training as an accountant, "bypassed" that method and instead made handwritten notations, some in Chinese, of any past due balances on the rent rolls. But the June rent roll he provided Richmar at closing was clean, without any such notations, and he stated that Richmar requested that both Tus certify the rent roll by signing it. Rick Tu acknowledged that there was no way to tell from the rent roll that Cinefe or any other tenant was behind on its rent.

Northeast also provided documents for use in pro-rating the June rent, taxes and other charges on the closing statement, including a list of all rent payments, CAM fees and taxes and a list of the amount of rents paid to date. These documents also reflect no past due rent balances. Moreover, at the request of the lender in the transaction, Branch Banking and Trust Company, Inc. ("BB & T"), Northeast obtained tenant estoppel letters from all of Covington Square's tenants, affirming the amount of their rent and the date through which the rent had been paid. Cinefe, however, did not complete the portion of the form showing the date through which it had paid its rent. May stated that he left that portion blank at Rick Tu's instruction. Elmore said that these letters were requested by and prepared specifically for the bank, and Richmar did not review the Cinefe letter until after the closing, although the corporation and its counsel received copies of the letters.

The closing was scheduled for June 7, 2006, and the day before, on the morning of June 6, Lee May called and left a message on Northeast's answering machine informing the Tus that due to nonpayment, "the power to the Theatre had been turned off, and we were shut down." Although it was Northeast's practice to check the answering machine daily for messages, Rick Tu denied receiving the message and stated that he only learned after the closing that Cinefe had shut down. In any event, Northeast did not inform Richmar at the closing that Cinefe was no longer in business.

According to Elmore, he specifically asked Rick Tu at the closing the next day if all the Covington Square tenants were current on their rent through May 31, 2006. Elmore said that Rick Tu responded that the tenants were current and there were no delinquen-

cies. James Norton, who attended the closing on behalf of the lender, BB & T, also "heard Rick Tu tell Elmore that all rents for Covington Square had been paid through May 2006" as they sat at the closing table. Moreover, Elmore said that Rick Tu did not inform Richmar of the payment plan he worked out with Cinefe, nor did he provide a copy of the payment schedule to Richmar prior to or at the closing. But Rick Tu stated that he told Elmore in the copier room that day that two tenants, including Cinefe, were behind on their rent: one tenant was behind for one month and Cinefe was about three months behind. Rick Tu also said that he told Elmore about the payment plan with Cinefe, but does not remember if he gave him a copy of the plan.

The parties proceeded with the closing, and as a part of the transaction, Richmar assigned its rights under the Agreement to Northwest and RAW, who became owners of Covington Square, so that Richmar could maintain its role as a management company.

Approximately two to three weeks after the closing, Richmar, Northwest and RAW became aware that Cinefe had shut down. A short time later, they obtained copies of the billing statements Northeast sent to Cinefe for February through May 2006, each of which reflected past due balances owed by Cinefe. For example, the May statement, which was prepared May 26, 2006 — two weeks after the June statement Northeast furnished to Richmar — reflected a past due balance of $37,456.92 in addition to the May rent of $16,479.99. Lee May submitted an affidavit stating that Northeast never sent Cinefe a billing statement for June 2006, and he was surprised when he later saw the statement Northeast provided Richmar because it did not reflect a delinquent balance. All the other statements May received from Northeast reflected past due amounts and "[t]here was, in fact, a substantial delinquent balance for rent owing by Cinefe to [Northeast] as of June of 2006." In fact, as of June 1, 2006, Cinefe owed Northeast approximately $70,416.90 in rent, $53,936.91 of which was past due.

After several weeks, Cinefe re-opened the theater and continued operating "on some scale" until the summer or fall of 2007, but Northwest and RAW only collected approximately $9,000 in rent during that period. They continued to work with Lee May on payment plans, but their records reflect that Cinefe owed over $310,000 in rent at the time it finally ceased operations in the late summer or early fall of 2007. Northwest and RAW eventually leased the space formerly occupied by Cinefe to a new tenant, which took possession on or about October 1, 2008 and began making rental payments in January 2009.

Northwest and RAW initiated this action on November 11, 2008. Northeast and the Tus moved for summary judgment on December

29, 2008, and in response, Northwest and RAW filed an amended complaint, asserting new claims, along with their opposition to the motion for summary judgment, on February 2, 2009. Following a hearing on the motion for summary judgment, the trial court gave an oral ruling of partial summary judgment on July 27, 2009, which was adopted into a one-sentence written judgment on July 28, 2009. The trial court's oral pronouncement reflects that the court granted summary judgment to Northeast and the Tus on the breach of contract claim arising out of Sections 6.3 and 8.13 of the Agreement. The trial court found that Richmar's failure to attach a rent roll as Exhibit C to the Agreement or to request an updated rent roll at the time of closing prevented Northwest and RAW from recovering under those sections.

The trial court further granted summary judgment as to any fraud claims "arising from either the failure to provide a current rent roll or information that document would have revealed as well as the paid-through date of Cinefe's rent." The trial court also ruled that no fraud claims could be asserted based upon Sections 6.3 or 8.13 of the Agreement. The trial court based this ruling on its conclusion that Richmar, as predecessor to Northwest and RAW, failed to conduct proper due diligence in failing to request an updated rent roll or to follow up on the incomplete information in Cinefe's tenant estoppel letter. Thus, the trial court concluded that "any claims based upon representations regarding Cinefe's rent status are barred based upon the failure to exercise due diligence and based upon the fact that that information would have been available through appropriate inquiry given the state of affairs at the time of the closing."

The trial court denied summary judgment, however, as to any fraud claims based upon the failure to disclose the dispossessory action against Cinefe and as to the claims for conversion,[3] conspiracy and punitive damages. In pronouncing its summary judgment determination, the trial court stated that "[i]nsofar as an amended complaint was filed, any claims asserted in the amended complaint that are not within the scope of the determinations made in this judgment would remain viable, having been filed; and those still remain pending."

1. Northwest and RAW first assert that the trial court erred in granting summary judgment on their breach of contract claims pursuant to Section 6.3 of the Agreement.

---

[3] The trial court denied summary judgment as to the conversion claim alleging that Northeast had failed to remit certain rent it received. Neither party appeals that portion of the trial court's ruling, and accordingly, we do not address it.

They contend that the trial court failed to properly construe the "intent and plain meaning of section 6.3." They note that while several portions in that section refer to "leases" as appearing on the rent roll that was to have been attached as Exhibit C, other portions refer to "Leases," with a capital "L," which is a defined term under the Agreement. Section 1.7 of the Agreement indicates that the term "Leases" refers to "all leases, licenses, or other permissions to occupy the Property." Northwest and RAW assert, therefore, that the portions of Section 6.3 referring to "Leases" stand on their own and are not invalidated by the failure to attach a rent roll as Exhibit C. Thus they contend that the trial court should have given effect to the portion of Section 6.3 in which Northeast warranted that all rental payments and other payments due under the "Leases" had been paid in full as of the date of the Agreement "other than as specified thereon," that is, as specified on Exhibit C. Northwest and RAW assert that the language "other than as specified thereon" should be interpreted only as a potential limitation to the general warranty that all rents were paid in full. And in the absence of an Exhibit C, they argue that the warranty is not modified or limited in any way, and Northeast must be charged with warranting that all rents had been paid in full as of the date of the Agreement. We agree.

"[I]t is a cardinal rule of contract construction that a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms." (Citations and punctuation omitted.) *Pomerance v. Berkshire Life Ins. Co. &c.*, 288 Ga. App. 491, 494 (1) (654 SE2d 638) (2007). Section 6.3 contains a number of warranties and representations by Northeast. The first warranty provides that the rent roll attached as Exhibit C is a full listing of all the "Leases" in force and affecting the property and the second warranty provides that no other leases are in effect other than those listed on the exhibit. We agree with the trial court that the absence of an Exhibit C renders these portions of Section 6.3 without effect. Thus, for example, if Northeast had failed to disclose any Lease, Northwest and RAW could not have relied upon Section 6.3 to assert any claims arising out of that omission.

But the failure to attach an Exhibit C did not necessarily render all the warranties and representations under Section 6.3 invalid. That section contains a separate warranty by Northeast that all rents and other payments due under the "Leases" had been paid in full, other than as specified on Exhibit C. Without an Exhibit C, that language must be interpreted as a blanket warranty that all rents and payments due and owing under "all leases, licenses, or other permissions to occupy the Property" had been paid in full. Representatives of both Richmar and Northeast signed the Agreement and

each corporation is charged with having read the Agreement and understanding its terms. See *My Fair Lady of Ga. v. Harris*, 185 Ga. App. 459, 460 (364 SE2d 580) (1987) (parties to a contract presumed to have read their provisions and to have understood the contents). Both sides of the Agreement, therefore, are charged with knowledge that no Exhibit C was attached and with an understanding of the effect of this omission on the Agreement's language. Thus Northeast chose to sign the agreement without any limitation on its warranty that all rents were paid in full as of April 4, 2006, despite the fact that Northeast's own records indicate that Cinefe was still at least $2,471.94 behind in its rent payments as of April 11, 2006. Accordingly, a jury issue exists as to whether Northeast breached the Agreement, and the trial court erred in granting summary judgment on the breach of contract claim as to all of Section 6.3.

2. Northwest and RAW also assert that the trial court erred in granting summary judgment as to their breach of contract claims under Sections 6.7 (b), 6.7 (c) and 6.7 (g) of the Agreement. Northwest and RAW first asserted these claims in their Amended Complaint, which was filed contemporaneously with their response to the motion for summary judgment. The trial court, however, expressly refrained from addressing any claims arising from the amended complaint in deciding the motion for summary judgment, as Northeast and the Tus acknowledge, and thus we find that the claims for breach of Section 6.7 of the Agreement remain pending before the court below.

3. Northwest and RAW further contend that the trial court erred in granting summary judgment on their fraud claims arising out of any alleged misrepresentations by Northeast and the Tus regarding the status of Cinefe's rent payments. Northeast and the Tus, on the other hand, assert that the trial court should have granted summary judgment as to all the fraud claims, including any claims arising out of the failure of Northeast and the Tus to inform Richmar of the dispossessory proceedings.

(a) The trial court granted summary judgment on the fraud claims, based upon its finding that Richmar failed to conduct proper due diligence by failing to request an updated rent roll or to follow up on the incomplete information in Cinefe's tenant estoppel letter. But we find that these factors, when considered in light of the entire record, raise jury issues precluding the grant of summary judgment. Under Section 8.13, Northeast had the obligation to deliver a rent roll one day before closing. And it is undisputed that Rick Tu brought a "clean" version of the June 2006 rent roll to the closing, which reflected no past due balances for any tenant. In fact, he stated that a rent roll, as he understood it, would not have provided such information. Although he often made handwritten notations of

balances on a rent roll as the month progressed, he explained that he followed an informal accounting process and that past due balances would be more readily reflected in the billing statements sent to the tenant. But it is also undisputed that Northeast provided Richmar a sanitized June billing statement for Cinefe, which reflected no past due balance, even though statements for the prior months had shown an ever increasing arrearage. Moreover, issues of fact exist as to whether Rick Tu verbally misrepresented the status of Cinefe's rent payments at closing.

Issues of justifiable reliance and proper due diligence are generally for the jury, and we find that jury resolution is required in this case. See *Miller v. Lomax*, 266 Ga. App. 93, 98 (2) (b) (596 SE2d 232) (2004); *Catrett v. Landmark Dodge*, 253 Ga. App. 639, 641 (1) (560 SE2d 101) (2002); *Wender & Roberts v. Wender*, 238 Ga. App. 355, 360 (4) (518 SE2d 154) (1999). Thus, it is for a jury to determine whether Northeast and the Tus were attempting to conceal Cinefe's true financial status prior to closing; whether further inquiry by Richmar would have, in fact, provided information about Cinefe's true status; whether Richmar justifiably relied upon information from Northeast and the Tus; or whether it should have made some further, independent inquiry.

And although the Tenant Estoppel Letter for Cinefe failed to reflect the date through which Cinefe had paid its rent, the evidence indicates that the estoppel letters were prepared at the request of and for use by the lender. Although copies of those documents were provided to Richmar and its attorneys, a question of fact exists as to whether they were obligated to review the estoppel letters prior to closing as part of the corporation's own due diligence and, if so, whether the Cinefe letter should have prompted further inquiry under the circumstances. *Miller*, 266 Ga. App. at 98; *Wender & Roberts*, 238 Ga. App. at 360 (4).

Thus we find as to the fraud claims, that jury issues remain regarding whether Northeast actively attempted to conceal Cinefe's financial problems from Richmar prior to the closing and whether Richmar's efforts at due diligence were reasonable under the circumstances, especially in light of its knowledge that Cinefe previously had been delinquent in its rent. Accordingly, we reverse the trial court's grant of summary judgment as to the fraud claims asserted by Northwest and RAW.

(b) Northeast and the Tus assert, however, that all the fraud claims in this case are barred because they arise from contractual duties set out in the parties' Agreement. "It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of

YALE LAW LIBRARY

contract to avoid harming him." (Citations and punctuation omitted.) *Sheppard v. Yara Engineering Corp.*, 248 Ga. 147, 148 (281 SE2d 586) (1981). But while "a tort action cannot be based on the breach of a contractual duty only, . . . it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law." (Citations omitted.) *Young v. W. S. Badcock Corp.*, 222 Ga. App. 218, 219 (1) (474 SE2d 87) (1996). Accordingly,

> [f]or the breach of a contract to give rise to a tort action, such breach of contract must also constitute a violation of a duty imposed by law to the public either by statute, law, or arising from the relationship created by contract, and there must be misfeasance rather than nonfeasance in failing to perform the contract for a tort to arise.

(Citations omitted.) *Satilla Community Svc. Bd. v. Satilla Health Svcs.*, 251 Ga. App. 881, 885 (1) (b) (555 SE2d 188) (2001), rev'd in part on other grounds, 275 Ga. 805 (573 SE2d 31) (2002).

On appeal, Northwest and RAW do not assert fraud in the inducement of the original Agreement[4] but rather contend that Northeast and the Tus made misrepresentations and wilfully concealed information after the Agreement was signed in order to induce Richmar into closing the sale of Covington Square.[5] Under OCGA § 51-6-2 (a), "[w]illful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action. Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action." This statute gives rise to a duty independent of any duty arising out of the parties' Agreement, and thus could support a claim of fraud. *Young*, 222 Ga. App. at 218 (1). As we have found that a jury issue exists as to whether Northeast and the Tus intentionally misrepresented or concealed Cinefe's financial situation with the intent to mislead Richmar, the fraud claims in this case are not barred as a matter of law.

---

[4] Thus the fraud claims would not be barred by the Agreement's merger clause, which provided that "all *prior* discussions, negotiations, understandings and agreements" were merged into the contract. (Emphasis supplied.) The representations at issue in this case occurred after the Agreement was signed. And although the clause also states that there are no parol or oral agreements existing between the parties regarding the transaction, the fraud allegations do not allege the existence of any agreements, but rather allege misrepresentations and fraudulent omissions intended to induce Richmar to close the transaction.

[5] Northwest and RAW note that under Section 7.1 of the Agreement, Richmar's failure to close on the sale, even if the failure were deemed a breach of the contract, would only have resulted in forfeiture of the earnest money deposit of $50,000.

(c) Northeast and the Tus argue, however, that the trial court erred in failing to grant summary judgment on the fraud claims arising out of Northeast's failure to inform Richmar about the dispossessory warrants it filed against Cinefe for back rent. They argue that Northeast had a contractual duty to inform Richmar of any lawsuits, and their failure to reveal the dispossessory actions at most could be construed as a breach of contract. But as noted above, if the jury determined that Northeast and the Tus concealed such information with the wilful intent to deceive or mislead Richmar and to-induce them to go through with the closing, a separate claim for fraud could lie. Accordingly, we affirm the trial court's denial of summary judgment on this ground.

4. Northeast and the Tus also assert that the trial court erred in denying their motion for summary judgment as to the claim of conspiracy, but they fail to articulate a clear ground for this argument. Jim and Rick Tu are officers and shareholders of Northeast. Northeast and the Tus suggest that it is "doubtful" that a corporation can even engage in a conspiracy with its own officers. But this Court has held that "because a corporation and its [shareholders] are . . . distinct persons, they may be held liable for conspiring with each other." *White v. Shamrock Bldg. Systems*, 294 Ga. App. 340, 348 (5) (669 SE2d 168) (2008). And Northeast and the Tus correctly note that "[w]here . . . a cause of action for damages for tort against the defendants is set out, the allegations showing a conspiracy make any actionable deed by one of the conspirators chargeable to all. The liability is joint and several." (Citations omitted.) *National Assn. for Advancement of Colored People v. Overstreet*, 221 Ga. 16, 22 (1) (a) (142 SE2d 816) (1965). Nothing in these assertions establishes any basis for reversing the trial court's denial of summary judgment on the conspiracy claim.

5. And as we have found that issues of fact exist as to Northwest's and RAW's claims for fraud and conspiracy, the trial court correctly denied the motion for summary judgment as to their claim for punitive damages. Under OCGA § 51-12-5.1 (b), punitive damages may be awarded where "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."

*Judgment affirmed in part and reversed in part. Phipps, P. J., and Johnson, J., concur.*

DECIDED JULY 13, 2010.

*Davis, Zipperman, Kirschenbaum & Lotito, Steven A. Suna*, for appellants.

*Tom Pye*, for appellees.