**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN, P. J., AND REESE, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**September 12, 2019**

# In the Court of Appeals of Georgia

A19A0855. TMX FINANCE, LLC et al. v. GOLDSMITH et al.

A19A0864. YOUNG et al. v. GOLDSMITH et al.

BARNES, Presiding Judge.

Jason Jue and Dr. Manning M. "Chip" Goldsmith, III, filed this direct action against Tracy Young and TY ICOT Investments, LLC (collectively, the "Young Defendants") and against TMX Finance LLC, TitleMax of Texas, Inc., and TitleMax of Georgia, Inc. (collectively, the "TMX Defendants"), alleging breach of a limited liability company's operating agreement, breach of fiduciary duty, breach of an option agreement, fraud, and other claims. The Young Defendants filed a motion to dismiss the plaintiffs' amended complaint or, in the alternative, for judgment on the pleadings, and the TMX Defendants filed a motion to dismiss the amended complaint. The trial court entered orders denying the defendants' respective motions. The

defendants then filed applications for interlocutory appeal, which this Court granted, leading to the present companion appeals. For the reasons discussed more fully below, we conclude that the plaintiffs failed to state a claim for breach of the option agreement, and we reverse the trial court's orders to the extent that the court declined to dismiss that claim. We affirm the trial court's orders in all other respects.

We review de novo a trial court's ruling on a motion to dismiss for failure to state a claim upon which relief may be granted and/or on a motion for judgment on the pleadings. *Northway v. Allen*, 291 Ga. 227, 229 (728 SE2d 624) (2012); *City of Albany v. GA HY Imports*, 348 Ga. App. 885, 887 (825 SE2d 385) (2019).

> A motion to dismiss for failure to state a claim upon which relief may be granted should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor.

(Citation and punctuation omitted.) *Austin v. Clark*, 294 Ga. 773, 774-775 (755 SE2d 796) (2014). See OCGA § 9-11-12 (b) (6). The same standard applies to a motion for

2

judgment on the pleadings, where, as here, "the parties moving for judgment on the pleadings do not introduce affidavits, depositions, or interrogatories in support of their motion." (Citation and punctuation omitted.) *Southwest Health & Wellness v. Work*, 282 Ga. App. 619, 623 (2) (639 SE2d 570) (2006). Additionally, the trial court in addressing the aforesaid motions may consider "any exhibits attached to and incorporated into the complaint and the answer." (Citation and punctuation omitted.) *Islam v. Wells Fargo Bank, N. A.*, 327 Ga. App. 197, 197 (757 SE2d 663) (2014). See *Early v. MiMedx Group*, 330 Ga. App. 652, 654 (768 SE2d 823) (2015). Mindful of these principles, we turn to the pleadings and exhibits attached thereto in the present appeals.

*The Founding of ICOT.* As alleged in the amended complaint, Goldsmith, a neurologist who specializes in complex ear procedures, started ICOT Hearing Systems, LLC ("ICOT Hearing") to provide low-cost hearing aides. Jue became involved in ICOT Hearing in its early stages and assisted in building the company into a multi-million dollar enterprise. Jue ran the day-to-day operations of ICOT Hearing as its sole manager.

ICOT Hearing is wholly owned by ICOT Holdings, LLC ("ICOT Holdings"). Until the incidents at issue in this case, Jue and Goldsmith together held a majority

interest in ICOT Holdings and controlled ICOT Holdings and ICOT Hearing (collectively, "ICOT").

*Young Becomes Involved in ICOT.* Young is the founder of the TMX Defendants, which are a "family of companies" consisting of title pawn companies and other businesses, and he controls their operations. In August 2015, Young began personally lending money to ICOT. Jue, Goldsmith, and Young knew that ICOT's "business model required additional cash beyond the accounts receivable for ICOT to sustain operations and continue to grow at a rapid pace," and that the goal of this "accelerated growth" model "was to sell ICOT to a third-party for tens of millions or hundreds of millions of dollars in the near term." Young "repeatedly told Jue to 'put his foot on the gas' with regard to the operations of ICOT" and assured Jue and Goldsmith that he would provide more funding.

*The Restructuring of ICOT.* On March 16, 2016, ICOT Hearing, ICOT Holdings, Jue, Goldsmith, Young, and Young's limited liability company, TY ICOT Investments ("TY Investments"), entered into a restructuring agreement under which Young loaned additional funds to ICOT Hearing and guaranteed two bank loans (the "Restructuring Agreement"). As part of the restructuring, TY Investments purchased membership units from several minority members of ICOT Holdings and from

4

Goldsmith. TY Investments also obtained exclusive one-year options to purchase additional membership units from several minority members and from Goldsmith. TY Investments's purchase of some of Goldsmith's membership units and its option to purchase additional units from him were memorialized in a Membership Interest and Purchase Option Agreement entered at the time of the restructuring of ICOT Holdings (the "Goldsmith Agreement"). Following the restructuring and prior to execution of the options, Jue and Goldsmith retained their controlling interest in ICOT Holdings.

Additionally, as part of the restructuring, ICOT Holdings, Jue, Goldsmith, TY Investments, and the other members of ICOT Holdings executed an Amended and Restated Operating Agreement for ICOT Holdings, which, among other things, placed certain duties on that company's managers, including the duties to conduct the business in good faith, to not engage in wrongful conduct, and to act in a manner that would not result in improper personal benefit to them (the "Operating Agreement"). Under the terms of the Operating Agreement, TY Investments acquired the power to appoint one of three members of the board of managers of ICOT Holdings. Pursuant thereto, TY Investments appointed Young as a manager of ICOT Holdings, and Young agreed to comply with the terms of the Operating Agreement while serving in that position.

*Young's Alleged Takeover Scheme Targeting Jue and Goldsmith.* If TY Investments had executed all of the options it had acquired from members of ICOT Holdings as part of the restructuring, Young, through TY Investments, would have acquired a majority interest in ICOT Holdings. However, according to the amended complaint, Young devised a scheme to obtain a controlling interest in ICOT Holdings through alternative means by causing an "existential funding crisis" at an opportune moment that could be used to divest Goldsmith and Jue of control without having to exercise the options.

*Young Allegedly Implements His Takeover Scheme.* In October 2016, two "reputable capital providers" discussed providing funds to ICOT beyond what Young had provided. The amended complaint alleged, however, that Young derailed these readily available sources of additional funding so that he could use ICOT's ongoing "cash needs" as leverage over Jue and Goldsmith when the opportunity arose to implement his takeover scheme.

In November 2016, a prospective third-party buyer that previously offered $8,000,000 to purchase ICOT expressed renewed interest in reaching a purchase agreement. Because of ICOT's growth, the parties entered into negotiations and discussed a purchase price of "approximately $100,000,000 for a sale at the end of

6

2016 or approximately $250,000,000 for a sale at the end of 2017." In preparation for a potential sale, ICOT Holdings negotiated and was approved for a line of credit from United Community Bank ("UCB") that would provide additional funds for the payment of ongoing and ordinary business expenses (the "UCB Line of Credit"). Young and Jue agreed to personally guarantee the UCB Line of Credit.

According to the amended complaint, after meeting with the prospective buyer, Young "seized the opportunity to begin his takeover" by means of a funding crisis. Because Jue and Goldsmith held a majority of the membership units in ICOT Holdings and "stood to profit significantly from the sale of ICOT," Young allegedly "did not want the sale to happen until he had wrested control and ownership from Jue and Goldsmith" and thereby could obtain a greater personal financial benefit from the sale. Consequently, the amended complaint alleged, Young began implementing his plan to create a funding crisis at ICOT that he could use as leverage over Jue and Goldsmith and as a means of delaying a sale to the third-party buyer.

Although the UCB Line of Credit had already been negotiated and approved for the purpose of paying ICOT's ongoing business operations and Young and Jue had agreed to personally guarantee the loan, Young allegedly refused to sign the guarantee necessary for releasing the funds unless Jue and Goldsmith would agree to

7

provide him with warrants entitling him to purchase additional membership units from them at a set price. Without the UCB Line of Credit, the amended complaint alleged, Young knew that ICOT would be "unable to make its scheduled employee payroll, unable to meet payment deadlines with vital component suppliers for ICOT's products, and unable to pay its marketing vendors which would result in all ICOT advertisements and marketing being pulled."

According to the amended complaint, the funding crisis caused by Young's refusal to sign the guarantee necessary to open the UCB Line of Credit ultimately caused the third-party buyer to cease its negotiations for purchasing ICOT. At a dinner with Jue, Goldsmith, and the buyer's representative, Young allegedly "represented the company's financial health in a poor and false light to the buyer's representative," stated that he wanted Jue terminated as manager of ICOT Hearing as a condition for providing needed funding for ICOT, maintained that he did not "want" ICOT if he could not control it, and threatened to dilute the membership interests of Jue and Goldsmith. Allegedly based on Young's statements and behavior at the dinner, the third-party buyer backed out of the negotiations. And because Young would not sign off on any further funding for ICOT when Jue and Goldsmith refused

8

to provide the requested warrants, ICOT remained in a state of financial crisis induced by Young.

*Inspection of ICOT's Books and Records by the TMX Defendants.* The amended complaint further alleged that as part of his takeover scheme, Young began questioning ICOT's books and financial records, even though a third-party accountant had found that ICOT's finances were within "expected and acceptable parameters" and ICOT had undergone three outside audits by three separate groups. Young allegedly "brought in personnel from his [TMX] web of companies to inspect ICOT's books and operations," falsely claiming that "he needed to look at the company through a 'static pool' analysis" to properly gauge the company's health. According to the amended complaint, the TMX personnel were able to enter and inspect ICOT's books and operations "under the false representation that they were present at Young's request to inspect ICOT's books and perform a financial analysis for purpose of the proposed sale of ICOT" to a third-party buyer. But the amended complaint alleged that the representations of Young and the TMX personnel were false because "the personnel brought in by Young had the real purpose of learning ICOT's operations so that when Young seized control of ICOT, the operations of ICOT could be run by Young's people who were under Young's control through their

9

employment in the TMX web of companies." The TMX personnel also allegedly represented ICOT's financial numbers in a false light to support Young's own representations about ICOT's books and finances.

*Young Takes Control of ICOT Holdings' Board of Managers.* Under the terms of ICOT Holding's Operating Agreement, the company's board of managers was composed of three individuals, and Young and Jue were two of the appointed managers. Pursuant to the Operating Agreement, the third manager was to be proposed by Jue and approved by TY Investments. According to the amended complaint, after creating the funding crisis at ICOT, Young took steps to take control of ICOT Holdings' board of managers through the wrongful appointment of the third manager. In particular, the amended complaint alleged that after a vacancy opened on the board of managers, Young extended an offer to his friend, Robert Pirkle, to serve as the third manager, and Pirkle accepted. Jue initially agreed to the appointment of Pirkle based on an alleged misrepresentation by Young, communicated through his agent and attorney, "that Pirkle's appointment was a requirement imposed by UCB" before it would allow the UCB Line of Credit to be drawn upon by ICOT Holdings. Despite the representation that the appointment of Pirkle to the board was necessary so that ICOT Holdings could begin drawing on the UCB Line of Credit, Young

10

refused to authorize the draw after Jue gave his approval to Pirkle's appointment. Jue later sought to rescind his approval of Pirkle's appointment, but by that point Pirkle had already accepted the offer to serve as the third board member.

*Termination of Jue.* On February 24, 2017, a meeting of ICOT Holdings' board of managers was held in which Pirkle attended and cast votes as one of the three managers on the board over the objections of Jue and Goldsmith. At the meeting, Young and Pirkle voted in favor of terminating Jue as manager of ICOT Hearing over the objection of Jue. The vote passed as a result of Pirkle's participation. After Jue was terminated as manager of ICOT Hearing, he resigned from his position on the board of managers of ICOT Holdings in March 2017.

*Dilution of Jue and Goldsmith.* During the February 24, 2017 board meeting, Young and Pirkle, over Jue's objection, also voted in favor of issuing a capital call in the amount of $6,000,000 to the members of ICOT Holdings. The capital call would result in increased membership interest percentages for those members who contributed their pro rata contributions to the capital call, and a corresponding dilution of the interests of those members who were unable to contribute. According to the amended complaint, at the time of the proposed capital call, the UCB Line of Credit was available to provide funding to ICOT without need of the capital call.

11

However, rather than permit ICOT Holdings to draw upon the UCB Line of Credit, Young allegedly sought the capital call for the specific purpose of diluting the membership interests of Jue and Goldsmith, whom he knew could not contribute to the capital call, and of increasing his own membership interest, after Jue and Goldsmith had refused to provide him with the warrants he requested. Young also allegedly contacted several minority members of ICOT Holdings and encouraged them to make their pro rata contributions to the capital call so as to "build an alliance" against Jue and Goldsmith.

The capital call was issued to the members of ICOT Holdings and required that their pro rate contributions be made in March 2017. According to the amended complaint, "Young singled out Goldsmith and Jue with respect to the capital call and for the purpose of ensuring that neither would meet the capital call," and to that end, "[w]hen a second notice of the capital call was sent out to the members of ICOT Holdings, it was not sent to Goldsmith and Jue." After the capital call was issued, some of the members of ICOT Holdings were able to contribute their pro rata shares and thus not suffer dilution. However, as allegedly foreseen by Young, neither Jue nor Goldsmith was able to make his pro rata contribution in response to the call, leading to the dilution of both their membership interests in ICOT Holdings. Because

12

of the capital call and resulting dilution, as of March 2017, Jue and Goldsmith had their membership interests reduced to "little or nothing," and Young obtained a majority, controlling interest in ICOT Holdings. After Young obtained control from Jue and Goldsmith, he allegedly brought in the same TMX personnel who had previously inspected ICOT Holdings' books and operations to run ICOT for him.

*Young's Proposed Sale of ICOT.* The amended complaint alleged that after Jue and Goldsmith had their membership interests diluted and Young had taken control of ICOT Holdings from them, Young contacted the same third-party buyer on March 15, 2017 and proposed the sale of ICOT at the "significant discount[ed]" price of $40,000,000. According to the amended complaint, in light of the dilution that occurred and the discounted sale price, Jue and Goldsmith would receive no money from the sale to the third-party buyer, in contrast to Young, who would profit from the sale.

*The Direct Action.* In March 2017, Jue and Goldsmith filed this direct action against the Young Defendants and the TMX Defendants.[1] In their complaint, as

[1] In February 2017, ICOT Holdings, at the direction of Jue and Goldsmith, filed a derivative action against the Young Defendants. The derivative action was later dismissed without prejudice. The Young Defendants sought to reinstate the derivative action, but the trial court denied their motion, and this Court affirmed the trial court in an unpublished opinion. See *ICOT Holdings, LLC v. Young*, __ Ga. App. __ (Case

subsequently amended, the plaintiffs alleged that they had suffered injuries separate and distinct from other ICOT members and asserted claims for breach of ICOT Holdings' Operating Agreement, breach of fiduciary duties, breach of the Goldsmith Agreement, and fraud. The plaintiffs also sought to recover under the theories of civil conspiracy and aiding and abetting liability, to pierce the corporate veils of the TMX Defendants, and to obtain compensatory damages, attorney fees and expenses, and punitive damages. Attached to the amended complaint as exhibits were, among other documents, ICOT Holdings' Restructuring Agreement, the Goldsmith Agreement, and the Operating Agreement.

The defendants answered, denying liability, and the Young Defendants attached multiple documents as exhibits to their answer, including the capital call documents. In later moving to dismiss the plaintiffs' amended complaint or, in the alternative, for judgment on the pleadings, the Young Defendants contended that the plaintiffs had failed to plead special injuries entitling them to pursue a direct rather than a derivative action on behalf of ICOT Holdings and had failed to state any claims upon which relief could be granted. In their motion to dismiss the amended complaint, the TMX Defendants maintained that the plaintiffs were not entitled to

No. A18A1427, November 29, 2018) (unpublished), cert. denied (Aug. 5, 2019).

14

bring a direct action and had failed to state any viable claims against them. The trial court denied the defendants' respective motions.

*Case No. A19A0864*

1. The Young Defendants contend that the trial court erred by holding that the plaintiffs, Jue and Goldsmith, pled special injuries permitting them to pursue their claims in a direct action rather than a derivative action on behalf of ICOT Holdings. According to the Young Defendants, the plaintiffs failed to allege any injuries they sustained that were different from other members of ICOT Holdings, and thus they were required to adhere to the procedural requirements for filing a derivative action under the Georgia Limited Liability Company Act, OCGA § 14-11-100 et seq., which the plaintiffs failed to allege that they had done. See *Pinnacle Benning v. Clark Realty Capital*, 314 Ga. App. 609, 615 (2) (a) (724 SE2d 894) (2012) (discussing the conditions that must be met for filing a corporate derivative action). We disagree.

> A derivative suit is brought on behalf of a corporation for harm done to it, and any damages recovered are paid to the corporation. And although plaintiffs may bring direct actions for injuries done to them in their individual capacities by corporate fiduciaries, our Supreme Court has held that to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation. In fact, to set

15

out an individual action, the plaintiff must allege either an injury which is separate and distinct from that suffered by other members, or a wrong involving a contractual right of a member which exists independently of any right of the corporation. Thus, for a plaintiff to have standing to bring an individual action, he must be injured directly or independently of the corporation. Furthermore, the determination of whether a claim is derivative or direct is made by looking to what the pleader alleged, and it is the nature of the wrong alleged and not the pleader's designation or stated intention that controls the court's decision.

(Punctuation and footnotes omitted.) *Crittenton v. Southland Owners Assn.*, 312 Ga. App. 521, 524 (2) (718 SE2d 839) (2011). See *Grace Bros. v. Farley Indus.*, 264 Ga. 817, 819 (2) (450 SE2d 814) (1994); *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584, 586 (1) (397 SE2d 699) (1990).

Among other things, the plaintiffs alleged in their amended complaint that they held a controlling interest in ICOT Holdings, but that Young then ousted them from control by orchestrating an unnecessary funding crisis in breach of his fiduciary duties as a manager of ICOT Holdings and through false representations and omissions about funding and other matters. The general rule is that the dilution of shares and voting power does not constitute a separate and distinct injury different from that suffered by the corporation and other shareholders, but that rule applies in

16

the circumstance "where the interests of *all* the shareholders were diminished in proportion to their ownership." (Emphasis supplied.) *Southwest Health & Wellness v. Work*, 282 Ga. App. 619, 626 (2) (b) (639 SE2d 570) (2006). In contrast, as another court has explained:

> Stockholders may maintain an action on an individual basis, as distinguished from a derivative action, against directors, officers, or others for the redress of wrongs constituting a direct fraud upon them, *as in the case where wrongdoers by fraud have seized control of the corporation from the complaining stockholders*.

(Emphasis supplied.) *Gieselmann v. Stegeman*, 443 SW2d 127, 131 (Mo. 1969). See 19 Am. Jur. 2d Corporations § 1943 (database updated May 2019) ("A stockholder may maintain an individual, as distinguished from a derivative, action against directors, officers, or others for wrongs constituting a direct fraud on him or her, such as losing control of the corporation as a result of fraud.") (footnotes omitted). That is the situation alleged here. Accordingly, because of the plaintiffs' loss of control resulting from the alleged breach of fiduciary duties and fraud specifically targeted at them by Young, the alleged harm to the plaintiffs was different from that experienced by ICOT Holdings and its minority members, and the plaintiffs thus sufficiently pled a special injury. See *Argentum Intl. v. Woods*, 280 Ga. App. 440, 447

17

(2) (e) (634 SE2d 195) (2006) (special injury shown because plaintiff-shareholders' "claims for fraud and conspiracy [were] personal to them").[2]

Additionally, the amended complaint alleged that the Young Defendants breached the Goldsmith Agreement, and Goldsmith was entitled to bring a direct action for the alleged breach of a contractual right owed specifically to him. See *Bobick v. Community & Southern Bank*, 321 Ga. App. 855, 869 (4) (b) (743 SE2d 518) (2013) (claim of breach of fiduciary duty predicated on allegation that company breached agreement to renew loan "clearly was not a shareholder derivative claim");

---

[2] See also *Horwitz v. Balaban*, 112 F. Supp. 99, 101-102 (S. D. N. Y. 1949) ("A stockholder has a personal right of action to attack and avoid a fraudulent increase of stock made and issued to another which results in depriving him of his relative position as a stockholder. A suit to protect this personal, primary right is not derivative because it is not maintained in the right of the corporation or brought on its behalf."); *Gatz v. Ponsoldt*, 925 A2d 1265, 1281 (III) (B) (2) (Del. 2007) (noting allowance of direct actions in cases where "the fiduciary exercises its control over the corporate machinery to cause an expropriation of economic value and voting power from [certain] shareholders"); *Kollman v. Cell Tech Intl.*, 279 P3d 324, 336 (Or. 2012) (applying Delaware law and concluding that direct action authorized where "the series of events culminating in the breach of fiduciary duty were not intended to – and did not – equally harm all shareholders. Rather, that breach advanced [the defendant's] goal of eliminating [the plaintiff's] participation in every aspect of corporate management and affairs."); 12B Fletcher Cyc. Corp. § 5915 (database updated Sept. 2018) (noting that direct action can be pursued based on "acts depriving one of the advantage of majority control" or "where an unlawful increase of stock ousts the complaining shareholders from their position as controlling shareholders").

*Crittenton*, 312 Ga. App. at 524 (2) (plaintiff can bring direct claim for breach of contractual right owed to plaintiff rather than to corporation). Furthermore, Jue was entitled to bring a direct action based on his alleged wrongful termination from his position as manager of ICOT Hearing. See *Kollman*, 279 P3d at 333-336 (plaintiff who had been a director, officer, and manager of corporation suffered "a unique harm" where, among other things, "his employment was terminated" as result of deceptive scheme by defendants).

For these reasons, the "allegations in the amended complaint, construed in the light most favorable to [the plaintiffs], and with all doubts resolved in [their] favor, do not disclose with certainty that [the plaintiffs] would not be entitled to relief under the 'special injury' exception." *Practice Benefits v. Entera Holdings*, 340 Ga. App. 378, 381 (2) (797 SE2d 250) (2017).[3] Accordingly, the trial court committed no error

---

[3] The Young Defendants also contend that the plaintiffs made an admission in judicio in the trial court that ICOT Holdings and all of its members were harmed by the Young Defendants' alleged misconduct, and, therefore, have admitted that they did not sustain a special injury. However, "alleged admissions in judicio may be read in context to determine [their] meaning." (Citation omitted.) *Meinhardt v. Christianson*, 314 Ga. App. 705, 709 (2) (b) (725 SE2d 828) (2012), citing *Morgan v. Howard*, 285 Ga. 512, 513 (3) (678 SE2d 882) (2009). The plaintiffs' purported admission was made in the context of their response to a motion filed by ICOT Holding to disqualify plaintiffs' counsel in this case because the same counsel had represented ICOT Holdings in the prior derivative action that was voluntarily dismissed. See supra footnote 1. When read in context, the plaintiffs response to that

19

in concluding that the plaintiffs could pursue their causes of action against the Young Defendants in a direct rather than derivative action.

2. The Young Defendants next argue that the trial court erred by holding that the plaintiffs stated a claim for breach of ICOT Holdings' Operating Agreement and/or breach of fiduciary duty. Again, we disagree.

"Under OCGA § 14-11-305 (1), the managing members of a limited liability company owe fiduciary duties to the company and its member investors." *Practice Benefits*, 340 Ga. App. at 380 (2). But "any fiduciary duties that a member of an LLC has may be modified or eliminated (with a few exceptions) by the operating agreement" pursuant to OCGA § 14-11-305 (4). *Ledford v. Smith*, 274 Ga. App. 714, 724 (2) (a) (618 SE2d 627) (2005). Here, Section 4.3 of ICOT Holdings' Operating Agreement set out the following duties of managers:

> (d) *Duties.* Each Manager shall conduct the business and affairs of the Company: (i) in good faith; (ii) in accordance with this Agreement; and (iii) in a manner that does not (x) constitute gross negligence or any intentional misconduct, (y) involve unlawful acts or omissions that the

motion clearly aimed to show that the interests of ICOT Holdings in the prior derivative action and of the plaintiffs in the present direct action were not materially adverse and that the disqualification of plaintiffs' counsel thus was not warranted. Nowhere in their response to the motion did the plaintiffs state that they suffered no special injuries compared to ICOT Holdings and its other members.

20

Manager knows or has reasonable cause to know are clearly unlawful, or (z) result in any improper personal benefit to the Manager (which, consequently, excludes any benefit derived by the Manager from any activity or investment permitted under this Agreement or otherwise approved by a Majority in Interest). . . .

According to the Young Defendants, the plaintiffs' amended complaint essentially alleged that Young, while serving as a manager of ICOT Holdings, violated his fiduciary duties as set out in Section 4.3 of the Operating Agreement by declining to provide additional funding for ICOT Holdings beyond the amounts he loaned and guaranteed under the Restructuring Agreement. The Young Defendants maintain that Young's failure to provide such increased funding did not violate any duties imposed upon ICOT Holdings' managers by the Operating Agreement and thus could not support a claim for breach of that agreement and/or for breach of fiduciary duty. The Young Defendants also argue that Young did not breach any fiduciary duties by voting for a capital call that led to the dilution of the plaintiffs' membership interests because the Operating Agreement allowed the board of managers of ICOT Holdings to approve calls for additional capital contributions.

We are unpersuaded. Contrary to the Young Defendants' contention, the plaintiffs' amended complaint did not simply allege that Young violated his fiduciary

duties under Section 4.3 of the Operating Agreement by failing to provide additional funding to ICOT Holdings beyond the loan and guarantees set out in the Restructuring Agreement and by voting for a capital call that led to dilution. Rather, as previously noted, the amended complaint alleged that to carry out his scheme to oust the plaintiffs from their position of control over ICOT Holdings, Young refused to sign the necessary documents for opening the UCB Line of Credit, which had already been negotiated and approved for the purpose of paying the company's ongoing business operations and which Jue and Young had already agreed to personally guarantee, solely because he wanted to create a funding crisis for ICOT Holdings that would provide him with leverage over the plaintiffs. The amended complaint further alleged that solely for the purpose of implementing his takeover scheme, Young derailed additional funding from two other "reputable capital providers" that was needed to meet ICOT Holdings ongoing cash needs, and he made false representations about ICOT Holdings' financial condition to the prospective third-party buyer so as to delay any sale and further increase his leverage over the plaintiffs. Additionally, the amended complaint alleged that Young, through his agent and attorney, made false representations to Jue about UCB requiring that Pirkle be appointed to ICOT Holdings' board of managers so that Pirkle would be appointed

22

to the board and Jue would be terminated, and then orchestrated a capital call for the sole purpose of ousting the plaintiffs from control even though the UCB Line of Credit had been approved and was available to provide funding to ICOT without need for such a call. Based on these allegations, the amended complaint asserted, among other things, that Young had acted in bad faith, had engaged in intentional wrongful conduct, and had acted for the purpose of obtaining an improper personal benefit.

Viewed in the light most favorable to the plaintiffs and with all doubts construed in their favor, the amended complaint does not disclose with certainty that the plaintiffs would not be entitled to relief under any state of provable facts. See, e.g., *McCabe v. Rainey*, 343 Ga. App. 480, 488 (2) (c) (806 SE2d 867) (2017) (trial court erred in granting summary judgment to defendant manager, where there was evidence that he "intentionally mismanaged the business" in violation of settlement agreement and/or in breach of his fiduciary duties); *ULQ, LLC v. Meder*, 293 Ga. App. 176, 178-180 (1) (666 SE2d 713) (2008) (summary judgment properly denied where there was evidence that manager acted unreasonably and in bad faith in violation of operating agreement by terminating officer "for the purpose of indirect personal pecuniary gain"). Consequently, the trial court committed no error in

denying the Young Defendants' motion to dismiss the plaintiffs' claim for breach of the Operating Agreement / breach of fiduciary duty.

3. The Young Defendants further contend that the trial court erred by holding that the plaintiffs' amended complaint stated a claim for breach of the Goldsmith Agreement. We agree.

The plaintiffs' amended complaint did not allege that Young, through TY Investments, violated the Goldsmith Agreement by failing to pay for Goldsmith's membership units that he promised to purchase or failing to pay for the option to purchase additional units from Goldsmith. Rather, the amended complaint alleged that Goldsmith agreed to give TY Investments an exclusive one-year option to purchase additional membership units from him "in exchange for Young comporting with the terms of the Operating Agreement." The amended complaint further alleged that as a result, when Young violated his fiduciary duties as manager of ICOT Holdings that were set out in Section 4.3 of the Operating Agreement (as discussed supra in Division 2), he failed to carry out what he had promised to do in return for the grant of the one-year exclusive option.

However, the Goldsmith Agreement, which was attached to the amended complaint, provided the following with respect to the grant of the option:

24

A. Grant of Option. *For and in consideration of the Young Line of Credit as set forth in the Restructuring Agreement*, together with one hundred and 00/100 dollars ($100.00), the receipt and sufficiency of which are hereby acknowledged (the "Consideration"), upon and subject to the terms and conditions set forth below, Seller hereby grants to Buyer the option to purchase 291,928 Units of the Company . . . .

(Emphasis supplied.) As made clear by this specific contractual provision, Goldsmith's grant of the option to Young was in exchange for the receipt of $100 and Young's agreement to the "Young Line of Credit as set forth in the Restructuring Agreement," not in exchange for Young's promise to comply with all of his duties as a manager as set forth in Section 4.3 of the Operating Agreement. While the amended complaint alleged otherwise, "[t]o the extent that there is any discrepancy between the allegations in the complaint and the exhibits attached to it, the exhibits control." *Racette v. Bank of America, N. A.*, 318 Ga. App. 171, 172 (733 SE2d 457) (2012).

It is true that an introductory paragraph of the Goldsmith Agreement provided:

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including, but not limited to those transactions set forth in that certain Restructuring Agreement . . . , the parties hereto agree as follows . . . .

25

The Goldsmith Agreement then went on to include more specific provisions, including provisions about Goldsmith's agreement to sell some of his membership units to Young at a set price, about his agreement to grant an option to Young to purchase additional units at a certain price, and about the various representations and warranties being made by the parties.

Even if the introductory paragraph could be construed as including the parties' compliance with the Operating Agreement as part of the consideration for the Goldsmith Agreement, "under general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive." (Punctuation and footnote omitted.) *Swisshelm v. Dept. of Human Resources*, 253 Ga. App. 816, 817 (560 SE2d 722) (2002). Hence, the specific provision of the Goldsmith Agreement addressing the particular consideration for Goldsmith's grant of the exclusive, one-year option prevails over the introductory paragraph.

For these reasons, the trial court erred in failing to grant the Young Defendants' motion to dismiss the plaintiffs' claim for breach of the Goldsmith Option Agreement for failure to state a claim upon which relief could be granted.

4. The Young Defendants maintain that the trial court erred by holding that the plaintiffs stated a claim for fraud. We do not agree.

26

"The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." (Citation and punctuation omitted.) *Insight Technology v. FreightCheck*, 280 Ga. App. 19, 28 (5) (633 SE2d 373) (2006). "Although fraud must be pled with particularity under OCGA § 9-11-9 (b), a complaint alleging fraud should not be dismissed for failure to state a claim unless it appears beyond a doubt that the pleader can prove no set of facts in support of his claim which would entitle him to relief." (Citation and punctuation omitted). *Roberts v. Nessim*, 297 Ga. App 278, 284-285 (2) (676 SE2d 734) (2009).

Here, the amended complaint alleged that as part of his scheme to oust the plaintiffs from their position of control over ICOT Holdings, Young "made several misrepresentations of material fact." More specifically, the amended complaint alleged that Young, individually and through TY Investments, failed to disclose his scheme to "to use the funding of ICOT as a means to extract more equity in ICOT Holdings from [the plaintiffs]," and instead assured the plaintiffs that ICOT Holdings' funding "was secure," even though he knew that his representation was false and made the representation only to induce the plaintiffs to forego any effort to obtain alternative sources of financing so that he could orchestrate a funding crisis. The

27

amended complaint further alleged that the plaintiffs relied on Young's assurances about the availability of funding and that if they had "known Young was making false representations and would ultimately seek to use his financial leverage to remove them from ICOT, [they] could have lined up other sources of financing. However, given the timing of Young's actions, [the plaintiffs] were left with no options."

Additionally, the amended complaint alleged that Young, individually and through TY Investments, "falsely represented that discrepancies in ICOT's books required analysis by persons from [the TMX Defendants]," and falsely claimed that he needed to have ICOT evaluated through a "static pool" analysis to properly evaluate its financial health. The amended complaint further alleged that Young's representations about the financial condition of ICOT and the need for an inspection of the company's books and records were pretextual because his "real purpose" was to have the TMX personnel learn ICOT's operations so that Young and TY Investments "could immediately take operational control of ICOT from [p]laintiffs and replace . . . Jue once he was terminated by the vote of Young and Pirkle," and so that Young could have the same TMX personnel immediately begin running the company once the takeover occurred. According to the amended complaint, the TMX personnel were able to enter ICOT and inspect its records based on "the false

28

representation that they were present at Young's request to inspect ICOT's books and perform a financial analysis for [the] purpose of the proposed sale of ICOT" to a third-party buyer.

Furthermore, the amended complaint alleged that Young's agent and attorney, acting at his behest, conveyed to Jue the false representation that Pirkle's appointment to the board of managers of ICOT Holdings "was a condition imposed by [UCB] before ICOT could draw on the line of credit for funds it needed to continue its operations." According to the amended complaint, in reliance upon the representation, "Jue initially consented to Pirkle's appointment under the belief that it was necessary for ICOT to draw upon the line of credit needed for operating expenses," which resulted in Pirkle's appointment to the board and the termination of Jue from his position as manager of ICOT Hearing.

The amended complaint alleged that when Young made these representations, "he knew they were false," that the plaintiffs justifiably relied on the false representations and omissions made by the Young and TY Investments, and that the plaintiffs suffered "substantial economic harm" as a result of the misrepresentations and omissions.

Given these allegations, we cannot say that it appears beyond a doubt that the plaintiffs can prove no set of facts in support of their claim for fraud that would entitled them to relief. See *Siavage v. Gandy*, __ Ga. App. at __ (2) (829 SE2d 787) (2019); *Hedquist v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 284 Ga. App. 387, 394 (2) (b) (643 SE2d 864) (2007). To the extent that the Young Defendants maintain that the amended complaint failed to allege each of the elements of fraud with sufficient particularity under OCGA § 9-11-9 (b), "the proper remedy for seeking more particularity is by motion for a more definite statement at the pleading stage or by the rules of discovery thereafter," not by filing a motion to dismiss. (Citation and punctuation omitted.) *Odom v. Hughes*, 293 Ga. 447, 455 (3), n. 6 (748 SE2d 839) (2013). See *Pampattiwar v. Hinson*, 326 Ga. App. 163, 170 (1), n. 3 (756 SE2d 246) (2014).

The Young Defendants, however, contend that each of the plaintiffs' allegations of fraud had fatal flaws. First, according to the Young Defendants, the plaintiffs' allegation that Young failed to disclose his scheme "to use the funding of ICOT as a means to extract more equity in ICOT Holdings from [the plaintiffs]" was "proven incorrect by the agreements attached to the Amended Complaint and [thus could not] serve as the basis for any fraud claim." Specifically, the Young Defendants

30

contend that the failure-to-disclose claim was contradicted by the plain terms of the Restructuring Agreement, which provided "on its face" that TY Investments was acquiring options to purchase additional equity in ICOT Holdings. The Young Defendants also argue that Operating Agreement made clear that the board of managers of ICOT Holdings could call for additional capital contributions with the result that members' shares could be diluted. However, it is plain from the amended complaint that the plaintiffs were alleging that what Young failed to disclose was his scheme to obtain a controlling interest in ICOT Holdings by causing an unnecessary "existential funding crisis" at an opportune moment that could be used as leverage to divest Goldsmith and Jue of control. Such a scheme clearly was not disclosed by the terms of the Restructuring Agreement or the Operating Agreement, and thus the Young Defendants' arguments based on those agreements is misplaced.

The Young Defendants also contend that the plaintiffs' allegations that Young made false representations about additional funding were barred by the merger clause contained in the Restructuring Agreement, which provided:

> This Agreement, the Loan Documents, the Option Agreement and the Membership Sale Documents constitute the entire agreement between the parties hereto and supercedes all prior agreements, if any,

31

understandings and arrangements, oral or written, between the parties hereto with respect to the subject matter hereof.

We agree that the merger clause would bar claims based on Young's alleged misrepresentations about funding that were made prior to or contemporaneous with the execution of the March 2016 Restructuring Agreement that contradicted the terms of that contract. See *First Data POS v. Willis*, 273 Ga. 792, 794-795 (2) (546 SE2d 781) (2001) ("In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.") (punctuation and footnote omitted). But the merger clause would not apply to new misrepresentations about additional funding sources made by Young *after* execution of the Restructuring Agreement, such as a representation by Young that additional funding "was secure" when in fact he allegedly had no intention of signing off on funding from other sources, such as the UCB Line of Credit, without first obtaining additional equity from the plaintiffs. See *Northwest Plaza v. Northeast Enterprises*, 305 Ga. App. 182, 192 (3) (b), n. 4 (699 SE2d 410) (2010) (merger clause did not bar fraud claim, where "[t]he

32

representations at issue in this case occurred after the Agreement was signed").[4]

Accordingly, we cannot say that within the framework of the amended complaint, the plaintiffs would be unable to come forward with evidence of fraudulent representations about additional funding that fell outside the scope of the merger clause in the Restructuring Agreement.[5]

Additionally, the Young Defendants argue that the plaintiffs could not have reasonably relied on Young's alleged misrepresentations about additional funding having been secured, about Pirkle's appointment to the board of managers being required by UCB for the UCB Line of Credit, and about the need for an inspection of ICOT Holdings' books by the TMX Defendants. We are unpersuaded. Because Young was a manager of ICOT Holdings and thus owed fiduciary duties to its members, including the plaintiffs, as set out in the Operating Agreement,[6] "we cannot

---

[4] A merger clause also "does not prevent a claim of fraud arising from representations in the contract itself." *Conway v. Romarion*, 252 Ga. App. 528, 532 (2) (557 SE2d 54) (2001).

[5] The Young Defendants further maintain that the plaintiffs' allegations that Young made false representations and omissions are barred by the economic loss rule, but "[t]he economic loss rule is inapplicable in the presence of passive concealment or fraud." *Holloman v. D.R. Horton, Inc.*, 241 Ga. App. 141, 148 (4) (524 SE2d 790) (1999).

[6] See supra Division 2.

33

say beyond a doubt that [the plaintiffs] could present no evidence showing that [they] justifiably relied on any representations by [Young]." *Stafford v. Gareleck*, 330 Ga. App. 757, 762-763 (2) (769 SE2d 169) (2015). See *Northwest Plaza v. Northeast Enterprises*, 305 Ga. App. 182, 191 (3) (a) (699 SE2d 410) (2010) ("Issues of justifiable reliance and proper due diligence are generally for the jury."); *Paul v. Destito*, 250 Ga. App. 631, 635-636 (1) (550 SE2d 739) (2001) (plaintiff shareholder was entitled to reasonably rely on defendants' assurances about compensation, given that defendants were directors who had fiduciary relationship with the company and its shareholders and were required to act in good faith).

The Young Defendants also maintain that the plaintiffs' fraud claim predicated on the inspection of ICOT's books by the TMX personnel fails as a matter of law because Young had a contractual right to conduct such an inspection, and thus the plaintiffs could not have prevented the inspection from going forward even if they had known of Young's true motivations.[7] It is true that the Goldsmith Agreement

[7]The Young Defendants further assert that the transcript of a dinner meeting between the parties and the potential third-party buyer, which was attached as an exhibit to the amended complaint, reflects that the plaintiffs did not actually rely on any misrepresentations by Young about the need for an inspection of ICOT's books by the TMX personnel. However, the transcribed conversation occurred after the inspection was already underway and reflects that the plaintiffs disagreed with Young's statements about discrepancies in the financial figures allegedly revealed

gave Young the right to conduct a "due diligence investigation" of ICOT prior to the exercise of the option to purchase additional membership units from Goldsmith. However, the amended complaint alleges that the inspection of ICOT's records was not done for the purpose of due diligence, but rather for the purpose of allowing the TMX personnel to learn the company's internal operations to facilitate a smooth takeover once Young ousted the plaintiffs from control by orchestrating the unnecessary funding crisis. Hence, the contractual provision allowing for a due diligence inspection did not preclude the plaintiffs from pursuing a fraud claim based on the inspection that allegedly occurred here.

Based on the aforementioned allegations of false representations and omissions contained in the plaintiffs' amended complaint, the trial court committed no error in denying the Young Defendants' motion to dismiss the fraud count.

*Case No. A19A0855*

5. The TMX Defendants contend that the trial court erred in denying their motion to dismiss the amended complaint because the plaintiffs failed to sufficiently

through the inspection. As the plaintiffs argued in the trial court, the cited portion of the transcribed conversation does not contradict their assertion that if they had "known the real reason behind the audit was to learn the operations to facilitate a quick and seamless takeover" using TMX personnel, they "would never have allowed the audit to go forward."

35

plead that the TMX Defendants could be held vicariously liable for the actions of their personnel whom Young brought to Georgia to inspect ICOT's books and operations.[8] According to the TMX Defendants, the amended complaint fails to sufficiently allege that their personnel were acting within the scope of and in furtherance of the TMX Defendants' businesses and instead reflects that they were acting at the personal behest of Young. We are unpersuaded.

"When an employee causes an injury to another, the test to determine if the employer is liable is whether the employee was acting within the scope of the employee's employment and on the business of the employer at the time of the injury." (Punctuation and footnote omitted.) *Thompson v. Club Group*, 251 Ga. App. 356, 358 (2) (553 SE2d 842) (2001). See *Chorey, Taylor & Feil v. Clark*, 273 Ga. 143, 144 (539 SE2d 139) (2000). "The employer is not liable for the employee's tort if the tort was committed, not by reason of the employment, but because of matters disconnected therewith." (Citation and punctuation omitted.) Id. However, "an employer may be held responsible for the tortious act of an employee where the act

[8] The TMX Defendants also contend that the trial court should have granted their motion to dismiss the amended complaint because the plaintiffs were not entitled to bring their claims in a direct action. This contention fails for the reasons discussed supra in Division 1.

36

was authorized by the employer prior to its commission." (Citation and punctuation omitted.) *Modern Woodmen of America v. Crumpton*, 226 Ga. App. 567, 568 (487 SE2d 47) (1997). See OCGA § 51-2-2 ("Every person shall be liable for torts committed by . . . his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily."); *Chorey, Taylor & Feil*, 273 Ga. at 144 (employer may be held liable "if the employee was authorized to accomplish the purpose in pursuance of which the tort was committed").

Here, the amended complaint alleged that "Young is the sole member of TMX and controls the operations and activities of both TMX and its subsidiaries, including TitleMax Texas and TitleMax Georgia"; that "[t]hrough his control of TMX, TitleMax Texas and TitleMax Georgia, Young flew individuals employed by TitleMax Texas and working out of Dallas, Texas to Savannah," including the "Chief Accounting Officer of the 'TMX Finance Family of Companies,'" to inspect ICOT's books and learn its operations; and that "Young's people . . . were under Young's control through their employment in the TMX web of companies, namely TitleMax Texas." And the amended complaint clearly sought to hold the TMX Defendants liable for the alleged tortious conduct of their personnel sent to Savannah.

37

In light of these allegations, the TMX Defendants have failed to demonstrate that the plaintiffs could not possibly introduce evidence within the framework of the amended complaint sufficient to hold the TMX Defendants vicariously liable for the allegedly tortious actions of their employees associated with the inspection of ICOT's books and records. See *Sumter Milling & Peanut Co. v. Singletary*, 79 Ga. App. 111, 114-115 (1) (53 SE2d 181) (1949) (corporation could be held vicariously liable for negligent driving of truck by its employee, even though truck was transporting Boy Scout group at the time of the accident, where managing officer of corporation specifically "instructed and commanded" the employee to transport the group in the truck, and the managing officer essentially functioned as the corporation's "alter ego," had been granted authority to "control and command the servants and employees of said corporation," and had unrestricted authority over use of the truck). See also *Alta Anesthesia Assoc. of Ga. v. Gibbons*, 245 Ga. App. 79, 86 (3) (537 SE2d 388) (2000) ("[E]very . . . business entity is responsible for torts committed by its servants *by its command* or in the prosecution and within the scope of its business.") (emphasis supplied). The trial court therefore committed no error in concluding that the amended complaint sufficiently pled allegations of vicarious liability.

38

6. The TMX Defendants further contend that the trial court erred in concluding that the amended complaint stated a claim for piercing the corporate veil. According to the TMX Defendants, the plaintiffs seek to hold the TMX Defendants liable for the misconduct of Young under an outsider reverse veil-piercing theory of liability that is not recognized in Georgia. We agree with the TMX Defendants that Georgia does not recognize outsider reverse veil-piercing, but we conclude that the amended complaint nevertheless stated a claim for piercing the corporate veils of the TMX Defendants.

> Under the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego or business conduit of another. The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility. Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control.

(Citations and punctuation omitted.) *Renee Unlimited v. City of Atlanta*, 301 Ga. App. 254, 259-260 (2) (b) (687 SE2d 233) (2009).

39

The doctrine of piercing the corporate veil "is generally used for the purpose of piercing the corporate veil to hold an individual stockholder liable for debts incurred by the corporation." *Gwinnett Property, N.V. v. G+H Montage GmbH*, 215 Ga. App. 889, 893 (2) (453 SE2d 52) (1994). However, when the elements of the doctrine are satisfied, the doctrine of piercing the corporate veil also can be used to hold a parent company liable for debts incurred by its wholly owned subsidiary, see *Kissum v. Humana*, 267 Ga. 419, 419-421 (479 SE2d 751) (1997); *Mark Six Realty Assoc. v. Drake*, 219 Ga. App. 57, 61-62 (2) (b) (463 SE2d 917) (1995), or to hold a "family of corporations" liable for the debts of each other. See *Derbyshire v. United Builders Supplies*, 194 Ga. App. 840, 845 (2) (a) (392 SE2d 37) (1990).

In contrast, a reverse veil-piercing claim seeks to hold a corporation liable for the debts incurred by an individual shareholder. See *Gwinnett Property, N.V.*, 215 Ga. App. at 893 (2).

> There are two types of reverse piercing claims–"insider" and "outsider" claims. See *Acree v. McMahan*, 276 Ga. 880, 881 (585 SE2d 873) (2003). . . . Outsider reverse veil-piercing extends the traditional veil-piercing doctrine to permit a third-party creditor to pierce the veil to satisfy the debts of an individual out of the corporation's assets. . . . [The] Supreme Court of Georgia in *Acree* refused to recognize outsider reverse veil-piercing as a viable claim. Id. at 881-883[.]

40

*Corrugated Replacements v. Johnson*, 340 Ga. App. 364, 369 (3) (797 SE2d 238) (2017). See *Holiday Hospitality Franchising v. Noons*, 324 Ga. App. 70, 70-71 (749 SE2d 380) (2013).

Here, the amended complaint alleged that "[t]he different TitleMax entities, including TitleMax Texas and TitleMax Georgia, operate under the umbrella of TMX, all described by TMX as the TMX 'family of companies,'" and that Young controls all of the activities and operations of TMX Finance and its subsidiaries, TitleMax Texas and TitleMax Georgia. The amended complaint further alleged that "Young is [the] sole shareholder and/or manager and/or employee and/or officer or director of TMX [Finance], TitleMax Texas and TitleMax Georgia"; that Young has "disregarded the corporate forms so as to authorize piercing of the corporate veils of these entities"; and that "Young has used, directed, and controlled TMX [Finance], TitleMax Texas and/or TitleMax Georgia for his personal aims of causing harm to Plaintiffs through the acts specified herein." The amended complaint alleged that "[t]he corporate veils of TMX [Finance], TitleMax Texas and TitleMax Georgia should be pierced because Young has overextended his privileges in the use of these corporate entities to defeat justice, perpetuate fraud, and evade contractual and tort responsibilities."

We cannot say that the plaintiffs could not possibly introduce evidence within the framework of the amended complaint to support a claim for piercing the corporate veils of the TMX Defendants. The TMX Defendants are correct that to the extent the plaintiffs seek to reach the assets of the TMX Defendants for any judgment debt personally incurred by Young under the theory of outsider reverse veil-piercing, such a claim is foreclosed by Georgia law. See *Acree*, 276 Ga. at 881-883; *Holiday Hospitality Franchising*, 324 Ga. App. at 70-71; *Corrugated Replacements*, 340 Ga. App. at 369 (3). However, construed in the light most favorable to the plaintiffs with all doubts resolved in their favor, the amended complaint stated a claim for holding TMX Finance liable for any judgment debt incurred by its subsidiaries, TitleMax Texas and TitleMax Georgia, under a veil-piercing theory, and for holding the TMX "family of companies" liable for any judgment debt incurred by each other under such a theory. See *Kissum*, 267 Ga. at 419-421; *Mark Six Realty Assoc.*, 219 Ga. App. at 61-62 (2) (b); *Derbyshire*, 194 Ga. App. at 845 (2) (a). Consequently, the trial court did not err in finding that the plaintiffs stated a claim for piercing the corporate veil.

7. The TMX Defendants further contend that the trial court erred in concluding that the plaintiffs stated a claim against them for fraud because the amended complaint failed to plead fraud with particularity. For the reasons discussed supra in

42

Division 4, the TMX Defendants have failed to show that the plaintiffs could not possibly introduce evidence within the framework of the amended complaint sufficient to support a claim of fraud. See *Siavage*, __ Ga. App. at __ (2); *Hedquist*, 284 Ga. App. at 394 (2) (b). The proper remedy for seeking more particularity, as previously noted, is to file a motion for a more definite statement or seek greater details through the rules of discovery. See *Odom*, 293 Ga. at 455 (3), n. 6; *Pampattiwar*, 326 Ga. App. at 170 (1), n. 3.

8. The TMX Defendants contend that the trial court erred in concluding that the plaintiffs sufficiently pled a claim for civil conspiracy. We disagree.

> To recover damages based on a civil conspiracy, a plaintiff must show that two or more persons combined either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. The conspiracy of itself furnishes no cause of action. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage. The essential element of the alleged conspiracy is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design. After the conspiracy is formed, members of the conspiracy are jointly and severally liable for acts of co-conspirators done in furtherance of the conspiracy.

43

(Punctuation and footnotes omitted.) *McIntee v. Deramus*, 313 Ga. App. 653, 656 (722 SE2d 377) (2012).

As explained supra in Divisions 2 and 4, the plaintiffs stated claims against the Young Defendants for breach of ICOT Holdings' Operating Agreement, breach of fiduciary duty, and fraud arising out of Young's alleged scheme to oust the plaintiffs from control of ICOT Holdings by orchestrating an unnecessary funding crisis. And the amended complaint alleged that the TMX Defendants, positively or tacitly, arrived at a mutual understanding with the Young Defendants as to how to accomplish those wrongful acts and acted in concert with the Young Defendants to carry out that common design. The amended complaint also contained allegations setting forth how the personnel of the TMX Defendants acted to assist in carrying out the conspiracy, namely, by learning ICOT's operations under the false pretense of conducting an inspection of the books so as to facilitate a smooth takeover of the company, and then by actually running the company once Young wrongfully ousted the plaintiffs from control.

Given these allegations, we cannot say that it appears beyond a doubt that the plaintiffs would be unable to introduce evidence within the framework of the amended complaint sufficient to support a civil conspiracy claim. See *Perry Golf*

44

*Course Dev. v. Housing Auth. of City of Atlanta*, 294 Ga. App. 387, 398 (8) (d) (670 SE2d 171) (2008) (plaintiff stated claim for conspiracy to breach fiduciary duty based on allegations that defendant and entities he controlled conspired to have the defendant breach his fiduciary duty by "siphoning off" company resources for his own benefit) (punctuation omitted); *Argentum Intl.*, 280 Ga. App. at 444-445 (2) (a) (discussing claim for conspiracy to defraud); *Gaines v. Crompton & Knowles Corp.*, 190 Ga. App. 863, 867 (5) (380 SE2d 498) (1989) (recognizing claim for conspiracy to breach contract).

9. The TMX Defendants also contend that the plaintiffs failed to sufficiently plead an aiding and abetting claim against them. We do not agree.

To establish a claim for aiding and abetting a breach of fiduciary duty,[9] a plaintiff must establish four elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted

---

[9] "[T]he tort of aiding and abetting fraud does not exist as a basis for liability under Georgia law. Instead, one who knowingly participates in a fraud may be held liable for the fraud." (Punctuation and footnotes omitted.) *Siavage*, __ Ga. App. at __ (1). As discussed supra in Division 7, the plaintiffs stated a fraud claim against the TMX Defendants.

45

purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citation and punctuation omitted.) *Cottrell v. Smith*, 299 Ga. 517, 532 (II) (B) (788 SE2d 772) (2016). See *City of Hawkinsville v. Wilson & Wilson, Inc.*, 231 Ga. 110, 111 (3) (200 SE2d 262) (1973) (noting that "one who procures or assists in the commission of an actionable wrong is equally liable with the actual perpetrator for the damages"); *White v. Shamrock Bldg. Systems*, 294 Ga. App. 340, 347-349 (5) (669 SE2d 168) (2008) (holding that defendant corporation, which did not itself owe a fiduciary duty to the plaintiff, could be held liable for assisting its employee in violating a fiduciary duty that the employee owed to the plaintiff, where the corporation knew that the employee owed the duty and acted with the requisite intent). Even where the defendant does not "lend [ ] . . . assistance in the actual perpetration of the wrong done by another," he "procures" a breach of fiduciary duty where he succeeds in causing another person to breach his fiduciary duty "through advice, counsel, persuasion, or command." (Citation and punctuation omitted.) *White*, 294 Ga. App. at 348 (5), n. 23.

Here, the amended complaint alleged that the TMX Defendants "aided and abetted" the Young Defendants in their wrongful takeover scheme, and based on the allegations in the amended complaint previously discussed and the fact that the "Georgia Civil Practice Act requires only notice pleading,"[10] we cannot say that it would be impossible for the plaintiffs to come forward with evidence within the framework of the amended complaint that would support a claim for aiding and abetting Young in the breach of his fiduciary duties owed to the plaintiffs. See *White*, 294 Ga. App. at 347-349 (5). Consequently, the trial court committed no error in denying the TMX Defendants' motion to dismiss the aiding and abetting claim.

10. Lastly, the TMX Defendants argue that the trial court erred in concluding that the plaintiffs stated claims against them for breach of fiduciary duty as set out in ICOT Holdings' Operating Agreement and for breach of the Goldsmith Agreement. For the reasons discussed supra in Division 3, the plaintiffs failed to state a claim for breach of the Goldsmith Agreement, and thus the trial court erred by not dismissing this claim against the TMX Defendants. However, the plaintiffs stated a claim against the TMX Defendants for breach of fiduciary duty as set out in ICOT Holdings'

---

[10] (Citation and punctuation omitted.) *Racette*, 318 Ga. App. at 180 (4).

Operating Agreement based on theories of civil conspiracy and aider-and-abetter liability, as discussed supra in Divisions 8-9.

*Judgments affirmed in part and reversed in part. McMillian, P. J., and Reese, J., concur.*