## A97A0320. BROOKSHIRE v. DIGBY.
### (481 SE2d 250)

ELDRIDGE, Judge.

In 1973, appellant, Virgil L. Brookshire, built an unusually constructed house to live in until he could sell it; a "For Sale" sign remained in the front yard. This was the second house that he had built. The house, located on Campground Road in Henry County, had a cathedral ceiling that ran the depth of the house with no ceiling joists; the roof was supported by the outside wall and an interior load-bearing wall that had knee bracing that ran from the top of the interior wall to the rafters, diagonally; except for the living room, where there was an angled suspended ceiling close to the rafters, the rest of the house had a suspended horizontal ceiling hanging by wires from the rafters with dead airspace above the drop ceiling, and the unusual framing could be detected only by placing an eight-foot stepladder under the drop ceiling, lifting a series of panels the length of the ceiling, and using a flashlight to inspect the closed airspace. The electrical fixtures in the hanging ceiling were also attached to the rafters by wires and not fixed to joists in the ceiling. Only one wall in the kitchen was covered by sheetrock; the rest of the exterior and interior walls were framed out with studs and covered by plywood paneling, not with sheetrock behind the paneling. When the house was built, appellant subcontracted all the work except the grading, insulation, paneling, and drop ceiling, which he did himself, but he generally supervised all the other work done.

Appellee, Marylee H. Digby, saw the for sale sign and visited the house in October 1985, when the appellant's daughter was home alone. At that time, she saw only the living room and kitchen. Appellee then talked to appellant several times by telephone about the house. Appellant told appellee that he was a home builder and that he had built the house for his family with good quality materials and workmanship, but did not reveal that this was only the second house that he had built and that it had an unusual framing and roof structure, which was concealed by the drop ceiling and that a layperson would not recognize as different. Appellee relied upon the representation that appellant was a home builder, that he did good workmanship using quality materials, and that the house had been built for appellant's family. Appellee looked at the house three times prior to signing the contract to purchase the house. Appellant urged appellee to look at a current home under construction to see the framing and

the type of work, quality of materials, and workmanship that he represented was present in his home, which appellee did; the house that appellant was building had ceiling joists and sheetrock ceilings, as well as sheetrock walls, unlike the house that was sold to appellee. Thus, the house appellee was urged to view under construction was not in fact representative, but such differences were not readily observable to the untrained observer. Appellant never told appellee that the Campground Road house had no ceiling joists because she never asked. Appellant never told appellee that the house had no ceiling above the suspended ceiling because she never asked. However, he did tell her that the suspended ceiling was used because it provided better insulation. Appellee could not see into the space above the drop ceiling unless she used a ladder, lifted a tile, and used a light, because there were no pull-down stairs and the area was dark above the drop ceiling. Appellant referred to the area above the drop ceiling as attic space, and he knew that appellee thought there was an attic from her comment about light from the top of the closet.

Appellee testified that she had been told that there were existing wiring and plumbing outlets in the basement for a washer-dryer, because appellant had a washer-dryer there previously, but when she moved into the house, the connections were not present. Appellant's answer was that the connections had been there but had been removed and could be reinstalled. She had been told that there was a gas space heater operating in the basement, but no line was connected to the LP gas tank. Appellee asked about the average monthly cost of heating and air conditioning and was shown a monthly bill for $125, which was represented to be the monthly average bill; the average heating bill actually ran around $300 each month. She asked about the well electric pump and was told that it had been replaced two years previously; after the first few months of appellee's occupancy, the pump went out and had to be replaced because it had worn out and was much older than two years. Appellant's explanation was that the pump had gone out while he had been away on a hunting trip and he had been charged for the replacement of the pump by the plumbers that his wife called. Appellee asked about termites and termite treatment, and appellant told her that there had been no problems, that he had treated the ground for termites, and that there was no termite damage. The spring that appellee moved into the house the termites swarmed, and a termite inspector found old termite damage. Appellant testified that they had never had problems with termites and that he had treated the ground for termites just as he had been instructed. Appellee asked if there was any water in the basement and was told that there never had been a problem; upon moving in, during the first really wet season, the basement flooded and continued to flood. Appellant testified that there

had been a problem with flooding in the past, but that new gutters and the poring of the patio had stopped the problem; when the problem existed, the leaking water had been minor; on cross-examination, appellant was impeached by his prior deposition testimony that the basement had flooded.

Appellee testified about a number of problems that she found upon moving into the house: drain lines that drained slowly because there was insufficient fall in the lines; plumbing leaks; movement in the walls and windows; no sheetrock walls behind paneling; washing machine drainage into the well. Appellant and his wife denied any knowledge of any problems in such areas. After appellee moved into the house, the insulation over the living room pulled loose, causing the suspended ceiling to collapse in the living room; the bathroom ceiling also collapsed bringing down the overhead light and exhaust fan; the Florida room ceiling collapsed twice. The overhead lighting secured by wire to the rafters collapsed. Appellee asked appellant if there were any defects in the house, and appellant told her no. When the well pump that was alleged to be only two years old failed, she called the plumber that appellant told her had replaced it, and she learned that he had not been called upon to work on the pump at all in the past by appellant or his wife.

Based upon an action in fraud, appellee obtained a verdict for $25,000 against appellant. Appellant's motion for directed verdict was denied by the trial court.

Appellant's sole enumeration of error is that the trial court erred in denying his motion for directed verdict.

Appellant made several representations to appellee which were not true, which were designed to mislead appellee, which she relied upon, which she could not discover in the exercise of reasonable care, and which she was damaged proximately to wit: the statement that the basement never had leaked; that the house had no defects; that there were washer-dryer connections in the basement; that there was an operating gas space heater in the basement; that the well pump had been replaced by a particular plumber within the last two years; and that there existed an "attic with floor joists" above the drop ceiling. All of these were disputed issues of fact as to credibility and as to whether appellant made such statements or not. All of the above fall into either positive misstatement of fact or active concealment of fact. "Mere concealment of (a material fact), unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of the falsehood constitutes an essential element.' [Cit.] 'The element of intention to deceive is as necessary in an action based on concealment as one based on wilful misrepresentation. (Cit.) An action for fraud and deceit must (be based upon a) representation (or . . . concealment) (which) was made with the intention and

purpose of deceiving the opposite party ((cit.)), and for the purpose of injuring him. (Cit.)' *Camp Realty Co. v. Jennings*, 77 Ga. App. 149, 151 (47 SE2d 917) (1948). 'In all cases of deceit, knowledge of the falsehood constitutes an essential element.' *Cooley v. King & Co.*, 113 Ga. 1163 (2) (39 SE 486) (1901). ' "In order to recover in an action of deceit, it is indispensable that the *scienter* be . . . proved." ' *Leatherwood v. Boomershine Motors*, 53 Ga. App. 592, 593 (186 SE 897) (1936)." *Lively v. Garnick*, 160 Ga. App. 591, 592 (1) (287 SE2d 553) (1981).

In the case sub judice, appellant denied flooding in his basement until impeached by his prior deposition. Appellant sent appellee to look at a different framing structure in a house that he was building, but represented to her that it was similar to his house; the house under construction had ceiling joists and an attic, which assisted in deceiving her that there were ceiling joists and an attic space above the drop ceiling in his house. The well pump was old and had not been replaced by the named plumber two years previously, as appellant told appellee. Appellant knew that, when remodeling the basement, he had removed the washer-dryer connections, but he represented that they existed. From such acts, an issue of scienter was raised.

The other latent defects, such as the absence of sheetrock walls and ceiling joists, also come under "passive concealment." See *Wilhite v. Mays*, 140 Ga. App. 816, 817-818 (232 SE2d 141) (1976), aff'd, 239 Ga. 31, 32 (235 SE2d 532) (1977). "[T]here is the situation where the seller knows of a material defect. He does not attempt to hide the problem from the prospective buyer and he does not prevaricate. He simply keeps his mouth shut. In situations such as this, the general rule in sales of real property has been caveat emptor — let the buyer beware. . . . [However], in cases of passive concealment by the seller of defective realty, we find there to be an exception to the rule of caveat emptor, which exception is applicable to the instant case. That exception places upon the seller a duty to disclose in situations where he or she has special knowledge not apparent to the buyer and is aware that the buyer is acting under a misapprehension as to the facts which would be important to the buyer and would probably affect its decision." *Wilhite v. Mays*, supra at 817-818; see also *Holman v. Ruesken*, 246 Ga. 557, 558 (272 SE2d 292) (1980); *P. B. R. Enterprises v. Perren*, 243 Ga. 280, 282-283 (4) (253 SE2d 765) (1979); *Perrett v. Dollard*, 176 Ga. App. 829, 830 (2) (338 SE2d 56) (1985); *Lively v. Garnick*, supra at 593. As the builder, general contractor, and homeowner, appellant had special knowledge about the house and that it was "unique" in its construction; the house was without ceiling joists and used knee braces, which facts were concealed by the drop ceiling. Further, there was an absence of sheetrock on exterior

and interior walls concealed under the paneling. In addition, from his conversations with appellee, appellant knew that the presence of "attic" space was important to her. Moreover, it can be argued that appellant's urging appellee to look at a conventionally framed house being built by him as an example of the construction in his house, as well as the quality of workmanship and materials, was an intentional act of deception, since the framing was radically different from the stick-built house on Campground Road; at the least, this factor showed that appellant knew that appellee had a different understanding of "attic space" and drop ceilings because appellant caused such misunderstanding by having appellee compare what was not comparable, the framing. Since the Campground Road house used a vaulted drop ceiling, wire-suspended fixtures, and no ceiling joists, which was very unusual construction, and did not have sheetrock on the walls, these were the very types of "passive concealment" issues that were intended to be dealt with under such theory of fraud and which appellee in the exercise of due diligence could not detect. Moreover, if appellee had detected these conditions, she would not have understood the significance of the construction, because it was so "unique."

The termite damage, the slow drainage of waste water, and similar defects were factual issues of which the jury could believe that appellant had actual knowledge, but denied knowing. However, this Court has designated this as constructive fraud, i.e., fraud without scienter, where the builder-owner "should have known" that the representations were not true or conceals material information that he "should have known"; it also has been treated as fraud through negligence. *Holmes v. Worthey*, 159 Ga. App. 262, 271-272 (282 SE2d 919) (1981), aff'd, 249 Ga. 104, 105-106 (2) (287 SE2d 9) (1982); *Rose Mill Homes v. Michel*, 155 Ga. App. 808, 810 (273 SE2d 211) (1980); *Davis v. Hopkins*, 50 Ga. App. 654, 656 (2) (179 SE 213) (1935). In the case sub judice, appellant's representations or failure to disclose as to such latent defects, about which he professes ignorance concerning their existence after building the house and living in it for 12 years, comes within this species of fraud. Reckless representation of facts as true without knowledge is actionable as a species of fraud without scienter. *Rose Mill Homes v. Michel*, supra at 810.

Appellant contends that a directed verdict should have been granted to him on the failure of appellee to exercise reasonable diligence to discover upon reasonable inspection the various latent defects. If after twelve years of living in the house, appellant had not discovered the termite damage, the slow drains or similar defects which he denies knowing, then it is reasonable to believe that appellee in her three visits would be unable to discover such latent defects either. In the absence of pull-down attic steps or an eight-foot step-

ladder and a light, appellee could not inspect the area above the drop ceiling; even pushing a tile up with a broom would not allow a view of the framing and knee braces; unless a number of tiles were removed, it would not reveal the absence of ceiling joists or the significance of their absence, because the framing was so "unique"; only appellant, as the builder, or someone of equal training would understand the significance of the framing and drop ceiling, if it could be readily seen. Appellant, by having appellee inspect the framing in progress in the uncompleted house, engaged in misdirection of appellee in her attempt to act diligently; appellant also knew that appellee placed unusual trust in him because he held himself out as a home builder who used high quality materials and workmanship. Obviously, appellee did not remember the old folk saying about the children of the cobbler not having shoes.

Appellee did make two extensive inspections of the premises and even brought her father to help inspect. More importantly, she asked many questions regarding the existence of defects and was given false, deceptive, or reckless answers or was otherwise misdirected, which defeated efforts to exercise due diligence. Under the various theories of fraud, due diligence must be proved in order to recover. See *Holman v. Ruesken*, supra; *Smith v. Stanley*, 223 Ga. App. 334 (477 SE2d 618) (1996); *Delk v. Tom Peterson Realtors*, 220 Ga. App. 576 (469 SE2d 741) (1996); *Hanlon v. Thornton*, 218 Ga. App. 500 (462 SE2d 154) (1995); *Miller v. Clabby*, 178 Ga. App. 821 (344 SE2d 751) (1986); *Lively v. Garnick*, supra. Where water leaks or other latent defects are not obvious or manifested through stains or other signs of damage, absent circumstances or other factors causing the defects to become discoverable, such as a rainy day, such latent defects are not discoverable through due diligence. *Wilson v. Brighton Homes*, 204 Ga. App. 677, 678-680 (2), (3) (420 SE2d 360) (1992); *Rose Mill Homes v. Michel*, supra at 809; see also *Smith v. Stanley*, supra. Where the latent defects were not discoverable through normal, visual inspection because of a drop ceiling which conceals the defects or walls that cover up the latent defects, then visual inspection would constitute due diligence under the circumstances. *Fincher v. Bergeron*, 193 Ga. App. 256, 259 (1) (387 SE2d 371) (1989). Under the circumstances, it is for the trier of fact, the jury, to determine if due diligence was exercised by the appellee under the facts and circumstances of the case sub judice; we cannot say as a matter of law that there was a failure to exercise due diligence when the jury found fraud. *Fincher v. Bergeron*, supra; *Rose Mill Homes v. Michel*, supra at 809; *Wilhite v. Mays*, supra.

"In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. *Folsom v. Vangilder*, 159 Ga. App.

844 (285 SE2d 583) (1981). The standard used to review the grant or denial of a directed verdict is the 'any evidence' test. *Ga. Dept. of Human Resources v. Montgomery*, 248 Ga. 465 (284 SE2d 263) (1981)." *Skelton v. Skelton*, 251 Ga. 631, 633 (4) (308 SE2d 838) (1983). The trial court did not err in denying the motion for directed verdict, because there exists more than "any evidence" to support the jury verdict for the appellee.

*Judgment affirmed. Birdsong, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 5, 1997 —

*Webb & Lindsey, Mark D. Oldenburg*, for appellant.
*Talley & Sharp, Daniel S. Digby*, for appellee.