**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 4, 2026**

# In the Court of Appeals of Georgia

A25A1810. JOHNSON et al. v. JOHNSON et al.

HODGES, Judge.

Marcia Anita Johnson and Rhonda Joy Johnson filed this appeal following a trial court order granting partial summary judgment to their siblings, Jimmy Johnson and Patricia Martin. The parties are involved in a family dispute over the trusteeship, control, and assets of a partnership and trusts established by their late mother, Willie B. Lusk Johnson.[1] Marcia and Joy argue that: (1) the trial court erred in finding that Jimmy and Patricia's removal as co-trustees is invalid because the way they were

---

[1] For clarity, the parties will be referred to by their first names, or, in the case of Rhonda Joy Johnson, by her preferred name, "Joy." Willie held various roles in the trusts and partnership at issue here. She will be referred to by her first name or as the "settlor," "trustor," "trustee," or other designation as appropriate to the trust or partnership being discussed, as will be outlined in more detail below.

removed did not satisfy a condition precedent in the trust; (2) if they were properly removed, the trial court erred in finding that the condition precedent was not met or waived; (3) the trial court erred in determining that their claims are partially time-barred by statutes of limitation; and (4) the court erred in finding that Joy's stake in a partnership is limited rather than general. For the reasons that follow, we affirm in part, reverse in part, and vacate in part, and remand the case to the trial court.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9–11–56(c).

> Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56(c) have been met. In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

*Cowart v. Widener*, 287 Ga. 622, 624(1)(a) (697 SE2d 779) (2010) (citations and punctuation omitted).

Viewed in the light most favorable to Marcia and Joy as the nonmovants, the record shows that Willie and her son, Jimmy, formed East Cherokee Drive Investment Partners, L. P. ("ECDIP") in 1998. Willie was named managing general partner, general partner, and limited partner; Jimmy was general partner. It appears that in 2001, Willie agreed to sell farmland for approximately $3.4 million. In 2004, Willie, Jimmy, and Patricia established the WBJ Family Trust, in which Willie was the trustor and Jimmy and Patricia were co-trustees. Willie capitalized ECDIP and the WBJ Family Trust with funds from the land sale. In 2014, Willie and Patricia became estranged during a dispute over a driveway easement Willie needed to access her home after the sale of the farmland. Willie successfully sued Patricia to obtain the easement over Patricia's property. Joy deposed that, around this time, Willie lost trust in Patricia and in Jimmy, because Jimmy supported Patricia in the easement dispute. As Willie stated in a trust document, Jimmy told her that when she sold the farmland, she "landlocked" herself; she at least in part blamed Jimmy for this "fraud[.]" Willie stated in the trust document that because Jimmy is a real estate agent and sold the property for her, receiving a five percent commission, he had a responsibility to protect her.

3

Prior to the conclusion of the easement litigation, on May 10, 2016, Willie established the Willie B. Lusk Johnson Living Trust (the "Living Trust"), in which she was both the settlor and trustee. That same day, she executed a "Removal of Co-Trustees and Appointment and Acceptance by Successor Co-Trustees" (the "Removal Document"), removing Jimmy and Patricia as co-trustees of the WBJ Family Trust and appointing Joy and Marcia in their stead. The Removal Document, which was filed in a court of record on May 20, 2016, specifically provides that Willie had "reasonable cause to remove Jimmy ... because he has acted negligently in protecting the best interests of the Trustor [Willie] in real estate matters requiring the Trustor to file legal suit in an attempt to obtain an easement to the Trustor's residence[,]" and that Willie had "reasonable cause to remove Patricia ... as the Trustor and Patricia ... are on opposite sides of a lawsuit[.]"

Willie died in 2020. On April 1, 2021, Jimmy and Patricia filed a complaint for a declaratory judgment, contending, inter alia, that they had been wrongfully removed as trustees and seeking a declaration that "they remain [t]rustees of the [t]rust[.] Marcia and Joy answered and counterclaimed on May 25, 2021, seeking a declaration that they remained the new co-trustees and raising, inter alia, counterclaims of breach

of fiduciary duty, breach of trust, breach of contract, and fraud against their siblings. Jimmy and Patricia moved for partial summary judgment, arguing that, as a matter of law, they were improperly removed as co-trustees because they had neither received 60 days' written notice as required by the terms of the WBJ Family Trust, nor had they been removed for reasonable cause in contravention of the requirements of the trust document. The motion also challenged Willie's conveyance of her ECDIP interest into the Living Trust, and asserted that Marcia and Joy's counterclaims were barred, in part, by statutes of limitation.

The trial court granted partial summary judgment to Jimmy and Patricia, finding that notice was a condition precedent to the removal of a trustee, and that Jimmy and Patricia had not been validly removed because they did not receive the requisite notice. The trial court also determined that Marcia and Joy's counterclaims were filed outside the applicable statutes of limitation, partially time-barring some of their claims, and that Joy held a limited, rather than general, partnership interest in ECDIP. Marcia and Joy now appeal.

1. Marcia and Joy argue that the trial court erred in finding that the WBJ Family Trust's 60-day notice provision was a condition precedent to the valid removal of

5

Jimmy and Patricia as co-trustees. Because the WBJ Family Trust's terms are not ambiguous, and clearly indicate that the 60-day notice provision applied to the removal of trustees only after Willie's death or incapacity, and not to trustee removals during Willie's lifetime, we find that the trial court's grant of summary judgment on this issue was in error.

"[T]he cardinal rule in trust law is that the intention of the settlor is to be followed." *Peterson v. Peterson*, 303 Ga. 211, 214(2) (811 SE2d 309) (2018) (citation and punctuation omitted). "The construction of a [trust] is a question of law, which we review de novo." *Buchanan v. Hannon*, 366 Ga. App. 769, 771 (883 SE2d 439) (2023).

> Broadly speaking, the terms of a trust are whatever the settlor intended them to be at the time of the creation of the trust so long as those terms are permitted by law. As with any contract, we look first to the language of the trust documents themselves to determine the settlor's intent. In construing an express trust, we look first and foremost to the language therein to effectuate the intent of the settlor, and we turn to parol evidence *only* if the trust instrument is ambiguous. The existence or nonexistence of an ambiguity is a question of law for the court.

*Ewing v. Scott*, 366 Ga. App. 466, 469(1) (883 SE2d 410) (2023) (citations and punctuation omitted).

> When the meaning of the words used in the will [or trust] is so plain and obvious that it cannot be misunderstood, then the plain and unambiguous terms must control. If the will [or trust] is ambiguous, however, the court may apply the rules of construction and consider parol evidence ... to ascertain the [trustor's] intent.

*Buchanan*, 366 Ga. App. at 771 (citations and punctuation omitted);[2] see also OCGA § 53-12-27 (permitting parol evidence to explain ambiguities). "[T]he entire document [should] be taken together, and operation should be given to every part of it." *Buchanan*, 366 Ga. App. at 771 (citation and punctuation omitted). With these standards in mind, we turn to the language of the trust.

> Section 9.5 of the WBJ Family Trust, entitled "Removal of Trustee," provides:

> *The Trustor shall have the right* at any time, and from time to time, to remove any trustee for reasonable cause and thereafter appoint another. However, the Trustor cannot under any circumstances designate herself or any person, firm, or corporation controlled by her to serve as such

---

[2] See generally Mary F. Radford, Georgia Trusts and Trustees § 14:1 (Nov. 2025 update) (noting that an optional provision in the Uniform Trust Code, Art. 1, § 112, provides that the rules of construction applicable to wills should also apply to the construction of trusts).

successor. *After the death or permanent mental disability of Trustor*, the adult beneficiaries and the guardian or guardians of the minor beneficiaries entitled to the income and principal of the trust or trusts then in existence, may, by a majority vote at any time and from time to time, remove any trustee for reasonable cause. *Such removal shall be accomplished by a sixty (60) day written notice to the Trustee to be removed, stating the grounds for removal and the effective date of such removal. In such an event*, the successor Trustee(s) shall be determined in accordance with Paragraph 9.1 above.

(Emphasis added.) Jimmy and Patricia contend that they did not receive 60 days' written notice stating the effective date of their removal. Indeed, the Removal Document appears to provide for their immediate removal, stating that they "are removed as Co-Trustees of the Trust."

The issue before us is whether the 60-day written notice provision is required only prior to removal of trustees by adult beneficiaries or the guardians of minor beneficiaries "[a]fter the death or permanent mental disability of Trustor," or whether it was also required when the trustor — that is, Willie — removed Jimmy and Patricia as trustees during her lifetime. The trial court found that the "[s]uch removal" language is ambiguous regarding whether it applies only to the language that immediately precedes it (the provisions for removing trustees after the trustor's death

8

or incapacity) or whether it also applies to the language at the beginning of the paragraph addressing Willie's ability to remove trustees during her lifetime. We, however, find no ambiguity because the language of the trust is clear.

We note at the outset that the phrases "[s]uch removal" and "[i]n such an event" are cast in the singular, as opposed to in the plural, i.e., "removals" or "events." This phrasing, and the fact that these words immediately follow the sentence that begins "[a]fter the death or permanent mental disability of the Trustor," indicates that these phrases and their attendant 60-day notice requirement apply only to a singular type of removal: a removal occurring after the trustor's death or incapacity, when beneficiaries or guardians are initiating the removal. It is also important to recognize that the "[s]uch removal" and "such an event" phrases are the only phrases in the paragraph that are *not* repeated related to each status the trustor occupies when a trustee is removed. By contrast, the language indicating that removals may take place "at any time, and from time to time" if they are for "reasonable cause" *is* repeated for each type of removal, i.e., those accomplished during the trustor's life and after her death or incapacity. Because, as noted above, the singular "removal" and "event" language is not repeated based upon the trustor's

9

status, the only logical reading of this language is that it means the 60-day notice provision is required *only* when trustees are removed after the trustor's death or incapacity — the relevant clause most proximate to the "such removal" language.

Paragraph 9.5 also references another part of the trust. Paragraph 9.5's final sentence provides, again in the singular and immediately following the clause addressing removal after the trustor's death or incapacity, that "[i]n such an event, the successor Trustee(s) shall be determined in accordance with Paragraph 9.1 above. Paragraph 9.1, entitled "Appointment of Successor Trustee," provides:

> Upon the death, incapacity or resignation of either of the original Co-Trustees, then *the Trustor shall designate* a successor Co-Trustee, which may be anyone except herself, or any person, firm, or corporation controlled by her. *If the Trustor is unable or unwilling* to appoint a successor Co-Trustee within ninety (90) days, then the remaining Co-Trustee shall serve as sole Trustee.

(Emphasis added.) Paragraph 9.1 then shifts immediately to a discussion of subtrusts, providing:

> Notwithstanding the foregoing, the following provisions shall apply to appointment of the Trustee of each subtrust created under Paragraph

10

5.3(B)[3] for the primary benefit of a child of Trustor (said child being hereafter referred to in this Paragraph as the "beneficiary"). After the death of the Trustor, each beneficiary shall become the sole trustee of the respective subtrust created for his or her benefit (and/or for his or her descendants). Should the beneficiary fail to qualify, or qualify but subsequently cease to serve, then such person(s) or entity as the beneficiary shall appoint within thirty (30) days of such vacancy shall serve as successor Trustee. If the beneficiary is unable or unwilling to appoint a successor trustee within thirty (30) days, then the successor trustee otherwise appointed under this Paragraph shall serve in this capacity.

The paragraph then shifts to a general discussion of both the trust itself and the subtrusts, providing:

All appointments of successor Trustees (including Co-Trustees) *pursuant to this paragraph* shall be made by signed instrument, may be prospective and contingent, and may designate further successors or the method for determining such successors. ... All such appointments of successor Trustees *made pursuant to this paragraph* shall be effective without the necessity of court approval. Each successor Trustee shall have the same rights, duties, discretions and powers as are assumed and conferred in this Trust Agreement upon the originally named Trustee,

---

[3] Paragraph 5.3(B) addresses administration of the trust after the trustor's death.

unless relinquished as to the successor Trustee under the provisions of this Agreement.

(Emphasis added.) In brief, the language of Paragraph 9.1 applies if a *trustee* leaves because of the trustee's death or resignation. As a result, Paragraph 9.5's phrasing regarding the trustor's ability, during her lifetime, to remove a trustee only for reasonable cause is inapplicable. The applicable portion of Paragraph 9.1 as it relates to Paragraph 9.5, rather, involves only the appointment of a new trustee when beneficiaries and/or guardians are handling the appointment. If the trustor, during her lifetime, chooses to remove a trustee pursuant to Paragraph 9.5 and its "reasonable cause" provision, she is then free to appoint a successor trustee so long as she does not appoint herself or someone she controls, as provided by Paragraph 9.1. The remainder of Paragraph 9.1 addresses appointments of trustees to the trust and subtrusts, and the status of beneficiaries after the trustor's death. Paragraph 9.1's language does nothing to indicate that Paragraph 9.5's 60-day notice provision applies to the removal of trustees, by the trustor, during the trustor's lifetime. See *Buchanan*, 366 Ga. App. at 771; see generally *F & F Copiers v. Kroger Co.*, 194 Ga. App. 737, 738(1) (391 SE2d 711) (1990) (recognizing, in the context of a contract, that even if its

language is difficult to construe, it is not ambiguous unless, even after an application of the rules of construction, its meaning remains unclear).[4]

We note that there is a difference, as the trust language recognizes, between the appointment of successor trustees and the removal of a trustee who is non-performing or damaging the trust in some way, and who may need to be removed quickly to preserve the trust assets. Looking at the "four corners" of the trust, see *Buchanan*, 366 Ga. App. at 771 (citation and punctuation omitted), Paragraph 1.2, entitled "Purpose of Trust[,]" clearly states that the trustor's intent in creating the trust is to accomplish "management" and "conservation" of the assets during her lifetime. This dovetails with the language of Paragraph 9.5, indicating that Willie's intent when the trust was created, see *Ewing*, 366 Ga. App. at 469(1), was to give herself the ability to promptly remove trustees if necessary to protect the trust's assets. We therefore reverse the trial court's determination on this point.

---

[4] We note also that the trial court found a "bona fide dispute of material fact regarding whether [Willie's stated rationale for removing Jimmy and Patricia as trustees] constituted 'reasonable cause' within Willie's intention when she established the WBJ Family Trust." That finding has not been appealed so we do not address it further.

2. Marcia and Joy also argue that if this Court finds that the removal provision was indeed a condition precedent, the trial court erred in failing to find that it had not been met or waived. Because of our determination in Division 1, we need not address this enumeration of error.

3. Marcia and Joy argue that the trial court erred in finding that their counterclaims for breaches of trust, fiduciary duty, and contract, as well as their counterclaim for fraud, were partially barred by statutes of limitation. They contend that the trial court should have found these limitation periods had been tolled. We affirm the trial court's ruling.

Marcia and Joy's counterclaims allege that despite repeated requests, Jimmy and Patricia have, inter alia, failed and affirmatively refused to provide them with "current records" of trust operations and assets, as well as records of partnership interests in ECDIP; have affirmatively failed to maintain adequate records and perform annual trust accountings; and have affirmatively disbursed trust and ECDIP assets in a manner that is self-dealing and in breach of their fiduciary duties. They also alleged that Jimmy and Patricia breached the terms of the trust by, among other things, failing to maintain records and provide accountings, and that Jimmy and Patricia

14

breached their fiduciary duties with the intent to defraud their siblings by suppressing or omitting material facts they were in good faith bound to disclose, such as by failing to provide annual accountings and access to trust records, engaging in self-dealing, and failing to disclose disbursements and compensation related to trust assets and ECDIP.

The sisters raised these counterclaims on May 25, 2021. The trial court determined that they were seeking damages dating back to 2003. Based upon the statutes of limitation it applied, the trial court determined that the limitations on counterclaims for breaches of trust, contract, and fiduciary duty were six years, meaning that any causes of action accruing prior to May 25, 2015 were time-barred.[5]

---

[5] See OCGA § 53-12-307(a) (setting a six-year statute of limitation on claims resulting when a beneficiary did not receive a report that adequately disclosed the existence of a claim against the trustee for a breach of trust, and running from the time the beneficiary "discovered, or reasonably should have discovered, the subject of such claim"); *Godwin v. Mizpah Farms*, 330 Ga. App. 31, 38-39(3)(b) (766 SE2d 497) (2014) (applying a six-year statute of limitation for breach of simple contracts under OCGA § 9-3-24 to breach of fiduciary duty claims related to a partnership agreement); see *Rollins v. LOR*, Inc., 345 Ga. App. 832, 841(1) (815 SE2d 169) (2018) (recognizing that Georgia has "no specific statute of limitation for breach of fiduciary duty claims, and instead, we examine the injury alleged and the conduct giving rise to the claim to determine the appropriate statute of limitation") (citation and punctuation omitted). Because Marcia and Joy have not argued that the trial court erred in its determination of the applicable statutes of limitation, "we need not address the propriety of the trial court's ruling in this regard." Id.

The trial court further found that the statute of limitation for fraud was four years, and that the fraud counterclaims were limited to those accruing on or after May 25, 2017.[6] In deciding the extent to which these claims were time-barred, the trial court found that Marcia and Joy had been on notice of problems and red flags as early as the spring of 2009, when, as they alleged both in their statement of additional disputed material facts and in their response to their siblings' motion for summary judgment, that they requested records and were met with "an emotional outburst from Jimmy Johnson."

Marcia and Joy do not allege an actual date when they discovered or were put on notice of the alleged fraud prior to asserting their counterclaims. They argue that, because of their siblings' fraud, concealment, and failure or refusal to disclose information, they received no financial records until after Jimmy and Patricia sued them in April 2021, meaning they "timely" filed their counterclaims in May 2021.

The trial court, on this point, found without explanation that Marcia and Joy's contentions that their siblings engaged in fraudulent concealment by failing to

---

[6] See *Coe v. Proskauer Rose, LLP*, 314 Ga. 519, 524-25(2) (878 SE2d 235) (2022) (recognizing that the statute of limitation for fraud is four years pursuant to OCGA § 9-3-31).

16

affirmatively disclose mismanagement and self-dealing was "legally inadequate" to toll the statute of limitation.

The cornerstone of Marcia and Joy's argument, as a result, is that a fiduciary's silence or failure to disclose fraud can alone toll the statute of limitation. They assert that they were not required to show that Jimmy and Patricia engaged in an affirmative act, trick, or artifice that prevented them from discovering the fraud; they also argue, however, that they have shown actual fraud involving moral turpitude and a trick or artifice used to deceive.

OCGA § 9-3-96 provides that "[i]f the defendant[s] ... are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."[7] To toll the statute of limitation under this statute, a plaintiff must show that: "(1) a defendant committed actual fraud;[8] (2) the fraud concealed the cause of action from

[7] In this case, as counterclaimants, Marcia and Joy essentially occupy the role of the plaintiffs to which our statutes and case law on this issue refer, and Jimmy and Patricia occupy the role of defendants.

[8] See *Lehman v. Keller*, 297 Ga. App. 371, 372-73(1) (677 SE2d 415) (2009) ("The tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.") (punctuation omitted).

17

the plaintiff; and (3) the plaintiff exercised reasonable diligence to discover the cause of action despite her failure to do so within the statute of limitation." *Rollins v. LOR*, 345 Ga. App. 832, 842(1) (815 SE2d 169) (2018) (citation and punctuation omitted). A plaintiff bringing an action for fraud bears "the burden of showing the existence of facts that would toll the statute of limitation." *Rollins*, 345 Ga. App. at 842-43(1) (citation and punctuation omitted).

In considering which actions toll the running of statutes of limitation, our Supreme Court has "distinguished between cases where the underlying claim is actual fraud, and cases where the underlying claim is something other than fraud." *Hunter, Maclean, Exley & Dunn v. Frame*, 269 Ga. 844, 846-47(1) (507 SE2d 411) (1998). If the gravamen of the underlying complaint is actual fraud, "the limitation period is tolled until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." Id. at 847(1) (citation and punctuation omitted). If, however, the gravamen of the underlying action is not a claim of fraud, the statute of limitation is tolled only upon a showing of "a separate independent actual fraud involving moral turpitude which deters a plaintiff from filing suit." Id. (citation and punctuation omitted).

The Supreme Court's opinion in *Frame* directly addresses the issue Marcia and Joy raise; that is, whether a confidential or fiduciary relationship, standing alone, is sufficient to toll statutes of limitation. The Supreme Court determined that:

> In such cases, before the running of the limitation period will toll, it must be shown that the defendant concealed information by an intentional act—something more than a mere failure, with fraudulent intent, to disclose such conduct, unless there is on the party committing such wrong a duty to make a disclosure thereof by reason of facts and circumstances, or the existence between the parties of a confidential[9] relationship.

*Frame*, 269 Ga. at 847(1) (citation and punctuation omitted). The *Frame* Court found that the Court of Appeals erred in relying on "this last phrase—'the *existence* … of a confidential relationship'" to find that a limitation period had tolled. Id. The Supreme Court went on to explain its reasoning:

> Because the *existence* of a confidential relationship between the parties, such as existed here, does not affect the *existence* of fraud—that is, the intention to conceal or *deceive—a confidential relationship cannot, standing alone, toll the running of the statute*. Rather, a confidential relationship

---

[9] See *King v. King*, 316 Ga. 354, 357(2) (888 SE2d 166) (2023) (finding that "all fiduciary relationships are confidential in nature," although not all confidential relationships are fiduciary relationships).

means only that the plaintiff has cause to rely upon, and place confidence in, the defendant. Thus, it affects only *the extent* of (a) the defendant's duty to reveal fraud, and (b) the plaintiff's corresponding obligation to discover the fraud for herself. Where a confidential relationship exists, a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under a heightened duty to reveal fraud where it is known to exist. Put another way, a confidential relationship imposes a greater duty on a defendant to reveal what should be revealed, and *a lessened duty on the part of a plaintiff to discover what should be discoverable through the exercise of ordinary care*. But the fraud itself—the defendant's intention to conceal or deceive—still must be established, as must the deterrence of a plaintiff from bringing suit.

*Frame*, 269 Ga. at 847-48(1) (emphasis added).

Pertinent to the instant appeal, the counterclaimants still have a "duty to exercise ordinary care and diligence to discover the fraud, even though a confidential relationship exists." Id. at 848(1). The Court went on to say that, "[i]t follows that the existence between the parties of a confidential relationship is not a separate and independent basis for tolling, but rather it is an important factor affecting the duty to disclose and the duty of ordinary diligence, to be considered in the fraud analysis itself." Id. Thus, even in the context of the fiduciary relationship, Marcia and Joy still

20

must show their siblings' intent to conceal or deceive and must establish that they were deterred from bringing suit by something other than simple reliance on the fiduciary relationship. Id. at 849(1); *Rollins*, 345 Ga. App. at 844(1).

Marcia and Joy do allege actual fraud in their counterclaims. They also argue that their siblings intentionally withheld, concealed, suppressed, or affirmatively denied them access to crucial trust and ECDIP reports, accountings, and assets. Further, they allege self-dealing, that their siblings failed to maintain trust and ECDIP assets in good and marketable condition, and that they were damaged by all of these actions or inactions. See *Rollins*, 345 Ga. App. at 846(1)(a) (even where there is a fiduciary relationship, "silence when one should speak, or failure to disclose what ought to be disclosed, is as much a fraud in law as is an actual false representation") (citation and punctuation omitted); accord *Hendry v. Wells*, 286 Ga. App. 774, 779(1) (650 SE2d 338) (2007) (finding that the statute of limitation for breach of fiduciary duty is triggered by a wrongful act accompanied by appreciable damage); OCGA § 23-2-53.

What Marcia and Joy fail to do, however, is make any showing or argument, or cite to any part of the record, to demonstrate that they satisfied their "duty to exercise

21

ordinary care and diligence to discover the fraud[.]" *Frame*, 269 Ga. at 848(1). "Fraud will toll the limitation period *only* until the fraud is discovered *or by reasonable diligence should have been discovered*." *Doe v. St. Joseph's Catholic Church*, 313 Ga. 558, 568(2)(c) (870 SE2d 365) (2022) (citation and punctuation omitted; emphasis added). Marcia and Joy simply contend that "the due diligence and its reasonableness is ***always*** for a jury to determine." It is true that "questions of reasonable diligence must often be resolved by the trier of fact." *Scully v. First Magnolia Homes*, 279 Ga. 336, 339(2) n. 11 (614 SE2d 43) (2005). It is also true, however, that "[a] party may fail to exercise due diligence as a matter of law." *Mayfield v. Heiman*, 317 Ga. App. 322, 326(2) (730 SE2d 685) (2012) (citation and punctuation omitted).

Here, even though under our standard of review we consider the evidence and inferences in the light most favorable to Marcia and Joy, the sisters have failed to point us to *any* evidence or inference of diligence prior to 2009.[10] This is the year the trial

---

[10] We note that, in their counterclaims, Marcia and Joy allege that, "[s]ince the date of the formation of the Trust [in 2004, they] *have never received a report or accounting of income and principal of the Trust* from [Jimmy and Patricia] as required under Section 8.2 of the Trust Document." (Emphasis added.) See generally *Antley v. Small*, 360 Ga. App. 617, 626(8) (859 SE2d 881) (2021) ("Mere ignorance of facts constituting a cause of action does not prevent the running of a statute of limitations. We have held that knowledge of a 'potential problem,' that 'something was amiss' and facts which 'should have raised a red flag' are sufficient to begin the running of

court found that tolling ceased because the sisters were put on notice that something was amiss. Specifically, the trial court recognized in its order that the sisters' Statement of Additional Material facts asserted that their requests for records were met by Jimmy's "'emotional outburst[s]' … '[a]s early as Spring, 2009.'" Because Marcia and Joy have provided no evidence or inference of diligence they exercised in response to this resistance from Jimmy that could have served to further toll the limitations period, we must affirm the trial court's grant of partial summary judgment to Jimmy and Patricia on this issue, albeit under a different rationale than that employed by the trial court. See *City of Gainesville v. Dodd*, 275 Ga. 834, 835 (573 SE2d 369) (2002) (recognizing the appellate courts may apply the right for any reason rule when reviewing grants of summary judgment).

4. Finally, the trial court's order referenced a pending probate court case, stating that if the probate court determined that Joy could inherit under the Living Trust, her interest in it would be that of a limited partner. On appeal, Marcia and Joy

---

the statute of limitation as it put a claimant on notice of his cause of action.") (citations and punctuation omitted).

contend that this was error. They argue that under the terms of the ECDIP and the Living Trust, Joy should inherit a general partnership interest.[11]

It is unclear from the parties' citations to the record exactly what issues are presently under consideration by the probate court. In any event, prior to a decision by the probate court regarding Joy's inheritance, if any, a determination of Joy's purported interest in the ECDIP is not just premature — it could possibly encroach upon matters under consideration by the probate court.[12] As a result, we vacate the trial court's order to the extent that it pre-determines Joy's interest in ECDIP.

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded. Pipkin, J., concurs; and McFadden, P.J., concurs as to Divisions 1, 2, and 4 and dissents as to Division 3.*

---

[11] Jimmy and Patricia's appellees' brief notes that "this issue appears to have become somewhat confused." Indeed, Jimmy and Patricia's motion for partial summary judgment does not even raise the issue of whether Joy's interest in the ECDIP is that of a general or limited partner. Rather, the motion sought a declaratory judgment stating that any purported transfer by Willie of her interest in ECDIP to Joy via the Living Trust was void for lack of unanimous written consent of all the general partners. See generally *Berlin v. City of Atlanta*, 368 Ga. App. 335, 338-39(1) (890 SE2d 68) (2023) (discussing permissible and impermissible sua sponte trial court actions on summary judgment).

[12] See OCGA § 15-9-30(a) (outlining probate courts' exclusive jurisdiction over certain subject matters).

# In the Court of Appeals of Georgia

A25A1810. JOHNSON et al. v. JOHNSON et al.

MCFADDEN, Presiding Judge, concurring in part and dissenting in part.

I respectfully dissent to Division 3. I concur in the remainder of the opinion.

I agree with the majority's restatement, in Division 3, of the applicable law regarding tolling of statutes of limitation, fraud debarring and deterring the bringing of an action, fiduciary duties, and reasonable diligence. I also agree that appellants' contention that "due diligence and its reasonableness is always for a jury to determine" is flat wrong. And I agree that the issue comes down to whether appellants have made a showing sufficient to authorize a jury to conclude that appellants "satisfied their 'duty to exercise ordinary care and diligence to discover the fraud[.]'"

And I agree that the record before us on that point is thin. Nevertheless I would hold that there is enough evidence before us to preclude summary judgment — at least for now. That evidence boils down to a single interrogatory response, to which the appellants' brief directs us:

> [R]epeated requests were made over the years by Defendants [appellants Marcia Johnson and Joy Johnson] and by Mrs. W.B. Johnson [Willie B. Lusk Johnson]. Defendants repeatedly asked Jimmy [Johnson] for records and told Jimmy that Mother [Willie B. Lusk Johnson] and Defendants had a right to know what was going on with the business and we want to see the records. Defendants do not recall the date of each such discussion. However, these conversations started as far back as Spring, 2002, at Marcia's house in Dalton, and Jimmy told her the Trust was not a Trust but was a contract between Jimmy and Mother, and said it was "none of their damn business." As early as Spring, 2009, Defendants each had verbal discussions with Jimmy Johnson at their Mother's property concerning the family business: the Partnership, the Trust, and Jimmy and Patricia's treatment of Mother concerning the driveway and her rights and needs for personal income, including a request to see the records, and Mother wants to see the bank records and has a right to see them. Each discussion resulted in Jimmy engaging in a tirade of hostile and vulgar obscenities, he said the Partnership was "nobody's damn business, except his and Mother's!", he engaged in hostile actions, such as pulling up to the garden in his truck, and just

staring at Joy working in the garden, saying nothing, but staring for periods of 15 minutes or more. This was a form of intimidation.

Defendants also heard Mrs. W.B. Johnson specifically ask for bank statements, asking for cancelled checks so she could see what the money was being spent on, including on occasions when he was asking her to sign stacks of blank checks.

Jimmy Johnson never had a civil conversation with either Marcia nor Joy or even his own mother regarding requests for books and records; because of Jimmy's aggressive behavior and actions, no records were ever provided to Defendants as requested.

A jury might conclude that Jimmy Johnson's emotional responses and intimidating behavior" defeated [the appellants'] efforts to exercise due diligence under the circumstances of this case." *Cistola v. Daniel*, 266 Ga. App. 891, 896 (598 SE2d 535) (2004) (citation and punctuation omitted). See *Brookshire v. Digby*, 224 Ga. App. 512, 517 (481 SE2d 250) (1997) (questions about defects were met with false, deceptive, or reckless answers, which defeated efforts to exercise diligence).

"A jury might also conclude that [Jimmy Johnson] was actively attempting to conceal [his and Patricia Johnson's alleged self-dealing and breaches of their fiduciary duties] and that further inquiry by [the appellants] would not have provided

3

information about those [actions]." *Nebo Ventures v. NovaPro Risk Solutions*, 324 Ga. App. 836, 842 (1) (d) ( 752 SE2d 18) (2013). So, it was for the jury to say whether Jimmy Johnson and Patricia Johnson were attempting to conceal material information and whether further inquiry would have revealed the information. See *Northwest Plaza v. Northeast Enterprises*, 305 Ga. App. 182, 190-191 (3) (a) (699 SE2d 410) (2010).

In *Rollins v. LOR, Inc.*, 345 Ga. App. 832 (815 SE2d 169) (2018), we rejected a tolling argument brought by parties who were asserting a claim similar to the one before us today. There, it was key to our analysis that those parties were trustees; they had been given a copy of the original trust documents and had a legal right to obtain additional materials. Id. at 846–47 (1)(a). Not so here. These appellants had no such powers.

I would hold that the record before us does not authorize us to determine as a matter of law whether or when appellants exercised the requisite ordinary care and diligence.